# In the
# United States Court of Appeals
## For the Seventh Circuit

Nos. 03-1412 & 03-1436

GERALD O'SULLIVAN, et al.

*Plaintiffs-Appellants,*

*v.*

CITY OF CHICAGO,

*Defendant-Appellee.*

---

Appeals from the United States District Court for
the Northern District of Illinois, Eastern Division.
Nos. 01 C 861 & 02 C 4300—**John W. Darrah**, *Judge.*

---

ARGUED NOVEMBER 7, 2003—DECIDED JANUARY 31, 2005

---

Before COFFEY, RIPPLE and KANNE, *Circuit Judges.*

RIPPLE, *Circuit Judge.* The plaintiffs in the two actions now before us are current and former lieutenants in the Chicago Police Department who were denied promotion to captain. They filed suit against the City of Chicago ("City") to enforce a consent decree entered in 1983 that required the City of Chicago to make hiring and promotion decisions without reference to an individual's political affiliation. The City moved to dismiss the complaints on the ground that the plaintiffs lacked standing to enforce the decree. The district court granted the motion to dismiss, and the plain-

tiffs appealed. We now reverse the judgment of the district
court and remand the case for further proceedings consis-
tent with this opinion.

# I

# BACKGROUND

## A.  The History of the Shakman Litigation

### 1.  The Original Shakman Litigation

In 1969, Michael Shakman, an independent candidate
seeking election to the Illinois Constitutional Convention,
and one of his supporters, brought suit on behalf of them-
selves, other candidates for public office and other voters
against a number of governmental entities and officials,
including the City of Chicago and its Mayor. The class of
plaintiffs alleged that the defendants maintained a patron-
age system: Government jobs were awarded (or retained)
based on a prospective employee's or current employee's
support of Democratic candidates. The plaintiffs alleged
that this patronage system violated the right of candidates
to associate with supporters, the right of voters to a free
electoral process and the right of public employees to asso-
ciate with candidates from other parties.

The district court dismissed the complaint for lack of
standing. It reasoned that the named plaintiff, as a candi-
date and voter, was the "wrong party to complain about al-
leged wrongs incurred by patronage workers." *Shakman v.
Democratic Org. of Cook County*, 310 F. Supp. 1398, 1401 (N.D.
Ill. 1969).

This court reversed. We stated:

The interest in an equal chance and an equal voice is
allegedly impaired in the case before us by the misuse

of official power over public employees so as to create a substantial, perhaps massive, political effort in favor of the ins and against the outs. We conclude that these interests are entitled to constitutional protection from injury of the nature alleged as well as from injury resulting from inequality in election procedure.

*Shakman v. Democratic Org. of Cook County*, 435 F.2d 267, 268 (7th Cir. 1970) ("*Shakman I*"). Following the remand, the City and the other defendants agreed to a consent judgment entered on May 5, 1972 ("1972 Consent Decree").

### 2. 1972 Consent Decree

The 1972 Consent Decree prohibited the defendants from "conditioning, basing or knowingly prejudicing or affecting any term or aspect of governmental employment, with respect to one who is at the time already a governmental employee, upon or because of any political reason or factor." Appellants' Sep. App., Ex.3 at 3. Furthermore, the district court retained jurisdiction "[t]o enable the parties to this Judgment to apply to this Court at any time for such further orders and directions as may be necessary or appropriate for the construction or carrying out of this Judgment, for the enforcement of compliance with the provisions contained herein, and for the punishment of the violation of any such provisions." *Id.* at 4. The district court also provided: "Application to enforce such provisions or to impose punishment for any such violation may be presented to this Court by any registered voter." *Id.* The decree did not address whether political considerations could be used in hiring new employees—a matter that continued to be litigated by the parties.

### 3. 1983 Consent Decree

The litigation on the unresolved hiring issue continued over the next decade. In September 1979, the district court granted the plaintiffs' motion for partial summary judgment on their hiring claim. *See Shakman v. Democratic Org. of Cook County*, 481 F. Supp. 1315 (N.D. Ill. 1979). The court stated that the patronage hiring practices infringed upon the plaintiffs' rights as voters and candidates because they gave the incumbent party an unfair advantage in elections. The court then directed the parties to address the appropriate form of relief.

On April 4, 1983, the district court entered an order enjoining the defendants from conditioning hiring decisions on an applicant's political affiliation. Although the City initially was bound by this order, it subsequently entered into a second consent judgment on June 20, 1983 ("1983 Consent Decree"), with respect to the hiring issue.

The 1983 Consent Decree enjoined the City from "conditioning, basing or affecting of employment with the City of Chicago on political reasons or factors while maintaining the ability of the elected officials of the City lawfully to establish, manage and direct the policies and affairs of the City." Appellants' Sep. App., Ex.4 at 2. The decree anticipated that the City would file, "not later than 120 days from the date this Judgment becomes effective," "a Plan of Compliance to implement this Judgment." *Id.* at 3. Finally, it was clear that the 1972 Consent Decree remained in effect and that the district court retained jurisdiction to ensure "enforcement of compliance with the provisions contained in the 1972 Consent Judgment and [the 1983] Judgment, and for remedy for the violation of any of those provisions." *Id.* at 8. Indeed, the 1983 Consent Decree provided that "[a]pplication to enforce those provisions or to remedy any

violation may be presented to this court by any registered voter." *Id.*

### 4. Plan of Compliance and Detailed Hiring Provisions

In 1984, the City issued its "Principles for Plan of Compliance" ("PPC") to implement the 1983 Consent Decree as well as its "Detailed Hiring Provisions" ("DHP"). The PPC applied to "hiring for all non-Exempt positions covered by the Judgment." *Id.*, Ex.5 at 2. Central to the PPC was the exclusion of politics from all hiring decisions except those for exempt positions and the elimination of the effects of the past patronage hiring system. The DHP applied to "all hiring decisions concerning individuals who currently are not employed by the City as well as to transfer, demotion, promotion, and reclassification decisions involving current City employees." *Id.*, Ex.6 at I-1. The DHP were amended in 1986 to provide that

> [p]romotions from a position with a lower grade classi-
> fication to a position with a higher grade classification,
> whereby both positions are in the same job category,
> shall be exempt from Public Advertising, Posting, and
> Application and Screening procedures if the *only* cri-
> terion that differentiates the higher classified position
> from the lower classified position is the period of ser-
> vice in the lower classified position.

R.16, Ex.F at II-8.

### 5. *Shakman II* Decision

Unlike the City of Chicago, several Cook County officials did not agree to the 1983 Consent Decree but appealed the district court's partial summary judgment in favor of the

plaintiffs. In 1987, this court issued its opinion in *Shakman v. Dunne*, 829 F.2d 1387, 1399 (7th Cir. 1987) (*"Shakman II"*). We first noted that "[t]his appeal raises only the constitutionality of politically-motivated hiring practices without any reference to the other patronage-based employment practices—including the discharge scheme now forbidden by the [1972] consent decree." *Id.* at 1393 (citations omitted). We also noted that significant changes had occurred since the plaintiffs had filed the action back in 1969:

> The case before us today is, from a *factual* viewpoint, a very different case from the case set forth in the complaint. The consent decree with respect to politically-motivated discharges, has eliminated a significant portion of the contentions that were originally presented in the appellees' complaint and that were before this court during the earlier appeal in 1970, seventeen years ago. . . . More importantly, we are confronted with a significantly different *legal* landscape than the one that confronted the district court at the time the complaint was originally filed . . . . During these intervening years, the Supreme Court has engaged in a thorough examination of "justiciability," the limitations imposed on federal courts by the "case-and-controversy" provision of article III.

*Id.* at 1392-93 (citations omitted; emphasis in original).

Although reconsideration of the plaintiffs' standing usually would be foreclosed by the "law of the case doctrine," we noted that the doctrine " 'was understandably crafted with the course of ordinary litigation in mind,' " *id.* at 1393 (quoting *Arizona v. California*, 460 U.S. 605, 618-19 (1983)), and that "courts are significantly less constrained by the law of the case doctrine with respect to jurisdictional questions," *id.* Our prior decision in *Shakman I* had noted that "the

voter's interest" asserted by the plaintiffs was entitled to "constitutional protection"; however, we never had examined the plaintiffs' alleged injuries according to the current standing requirements—namely whether the plaintiffs had suffered a " 'personal injury fairly traceable to the defendant's allegedly unlawful conduct and likely to be redressed by the requested relief.' " *Id.* at 1394 (quoting *Allen v. Wright*, 468 U.S. 737, 751 (1984)). Thus, we examined, for the first time, the plaintiffs' claims against this standard.

We noted that, although the plaintiffs had asserted several injuries, "the heart of the plaintiffs' case [wa]s their contention that the hiring practices of the defendants violate[d] the speech and associational rights of candidates and voters." *Id.* at 1395. Focusing on the requirement that the injury must be "fairly traceable to the defendants' activity," we concluded that the connection between the patronage hiring practices and the dilution of the voter's political voice was too attenuated to meet the standing requirement:

> For each citizen, many factors, many not capable of articulation, will determine the nature and extent of that person's political activity. For those recruiting such political workers, political incumbency has advantages and disadvantages. In some political environments, a patronage hiring policy by the incumbents may enjoy a good deal of credibility with potential workers. Not only may the incumbents be able to point to a successful political track record, but they may also be able to demonstrate their determination to implement such a policy by their present actions. Moreover, in many instances, although not always, the incumbent enjoys certain natural advantages in communicating with the citizenry. However, in other political environments, incumbency may well be a ball and chain on the leg of the candidate and the announcement of such a patron-

age policy may, far from being an advantage, seal his political doom. Indeed, it may be the challenger who can attract workers with the promise that, once elected, he will continue to seek the help of those who have supported him. We do not believe, therefore, that the plaintiffs can assert, with the certainty required by the case-and-controversy requirement, that the injury they assert is "fairly traceable" to the actions of the defendants that form the basis of their complaint.

*Id.* at 1397. Our holding, however, did not encompass all voter challenges of *any* patronage practices; it was limited to

plaintiff's standing to attack the constitutionality of the defendants' hiring practices. Our holding d[id] *not* address the substantially different question of whether the plaintiffs would have standing to attack the constitutionality of the coerced political work demanded of those already employed by the government as a condition of continued employment.

*Id.* at 1399 (emphasis in original).

### 6. Other Considerations

Several years after our decision in *Shakman II*, the Supreme Court handed down its decision in *Rutan v. Republican Party of Illinois*, 497 U.S. 62 (1990), in which it addressed "whether the First Amendment's proscription of patronage dismissals recognized in *Elrod v. Burns*, 427 U.S. 347 (1976), and *Branti v. Finkel*, 445 U.S. 507 (1980), extends to promotion, transfer, recall, or hiring decisions involving public employment positions for which party affiliation is not an appropriate requirement." *Rutan*, 497 U.S. at 68 (parallel citations omitted). *Rutan* did not speak to standing requirements but made clear that basing hiring decisions on

political patronage was impermissible. The Court held "that promotions, transfers, and recalls after layoffs based on political affiliation or support are an impermissible infringement on the First Amendment rights of public employees." *Id.* at 75. The Court determined that "[u]nder [its] sustained precedent, conditioning hiring decisions on political belief and association plainly constitutes an unconstitutional condition, unless the government has a vital interest in doing so." *Id.* at 78.

In the wake of *Rutan*, the plaintiffs moved to reinstate the district court's April 4, 1983 judgment against the non-settling defendants. In response, the non-settling Cook County defendants[1] eventually entered into a consent judgment similar to that which the City had entered—the 1983 Consent Decree—and also filed similar plans of compliance.

## B.  Present Litigation and District Court Proceedings

This appeal consists of two consolidated complaints filed by Chicago police lieutenants against the City of Chicago. In their complaint, the plaintiffs described the action as a "civil action to enforce the judgment in Shakman vs. Democratic Party of Cook County, Civil Action No. 69 C 2145." R.55, ¶ 1. They alleged that they were "registered voters, residents of the City of Chicago who were police lieutenants who applied for the position of Captain and who met the eligibility requirements for selection as captain." *Id.*, ¶ 15. The plaintiffs further claimed that they were denied promotion to captain as a result of the City's violation of the 1983 Consent Decree through the City's failure to comply with the requirements of the DHP. The plaintiffs sought various

---

[1]  *See supra* part I.A.5.

forms of relief, including: (1) the issuance of a rule to show cause "why defendant ought not be held in civil contempt for failure to comply with the terms of the Shakman Decree, Plan and Principles"; (2) a directive to the City to "adhere to the provisions of the Shakman Decree, Principles and Plan in all future selections for nonexempt positions"; and (3) "relief to plaintiff and other persons who are found to have sustained injury and damages as a result of the violations." *Id.* at 9.

The City moved to dismiss the complaints on the ground that the plaintiffs "fail[ed] to allege any injury to their associational rights as voters and thus, lack Article III standing." R.58 at 6. Specifically, the City maintained that, "[a]lthough plaintiffs allege[d] that they are registered voters, their claims [we]re subject to dismissal because they d[id] not plead notice of an injury to their First Amendment associational rights that is fairly traceable to the captain's promotions at issue in this case." *Id.*

The district court agreed with the City. In its order granting the motion to dismiss, the court first reviewed the history of the *Shakman* litigation, the 1983 Consent Decree, the PPC and the DHP. The district court then turned to the plaintiffs' allegations, which it described as follows:

> Plaintiffs allege that as a direct and proximate result of the actions of the Defendant, Plaintiffs sustained injury, including lost wages and benefits because they were not promoted to captain. In Count II, Plaintiffs seek a petition for rule to show cause why Defendant ought not be held in contempt of court for failing to comply with the Shakman Decree, the [PPC], and the DHP.

R.64 at 4. The district court next addressed the City's contention that the plaintiffs lacked standing. The court noted that the 1983 Consent Decree grants standing to enforce the decree to any registered voter. In addition, the court noted

that a party seeking to enforce the decree also must show "an injury in fact, a causal connection between the injury and the challenged conduct, and that its injury will be redressed by a favorable decision." R.64 at 5 (citing *Plotkin v. Ryan*, 239 F.3d 882, 884 (7th Cir. 2001)). The court further noted that "[p]laintiffs have the burden of establishing standing, and each element of standing must be supported 'by more than unadorned speculation.' *Plotkin*, 239 F.3d at 885." *Id.* The court then determined that the plaintiffs had not met this burden; it explained:

> In the instant case, Plaintiffs alleged that they are registered voters who met the eligibility requirements for selection as a captain in December 2000 and January 2001 but were not selected for such promotions. They allege that the promotion process was in violation of the Shakman Decree, the [PPC], and the DHP.

> "*Shakman* prohibits only political considerations *which effect* [sic] *voter and candidate rights*." *Shakman v. Democratic Org. of Cook County*, 356 F.Supp. 1241, 1248 (N.D. Ill. 1972); *see also Herron v. City of Chicago*, 619 F.Supp. 767, 773 (N.D. Ill. 1985) (Shakman judgment "enjoins the defendants from hiring or refusing to hire employees based on political considerations"). In the instant case, Plaintiffs have not pled that the challenged promotion practice adversely affected their rights as voters or candidates. Furthermore, Plaintiffs do not allege that political considerations were at the heart of the promotion process. Instead, the Plaintiffs allege that they were denied a promotion because certain procedures were not followed. Accordingly, Plaintiffs have failed to establish an injury in fact to their rights as voters to bring an action to enforce the Shakman Decree.

*Id.* at 5-6. Because the plaintiffs did not establish standing to enforce the action, the district court granted the City's

motion to dismiss.[2]

<hr>

[2] The court also noted that "the selection process that the Plaintiffs dispute is contained in the [Collective Bargaining Agreement]," which set forth a grievance and arbitration process. Consequently, a civil enforcement action was an improper method of resolving the dispute. R.64 at 6. With the exception of this statement, the district court opinions disposing of the consolidated cases, 02 C 4300 and 01 C 0861, were the same.

The plaintiffs set forth three shortcomings with respect to the district court's determination that the plaintiffs' claims are governed by the Collective Bargaining Agreement. Specifically, the plaintiffs demonstrate that this agreement could, at most, cover the claims of Plaintiff O'Sullivan, that it is questionable whether the agreement covers O'Sullivan given that the agreement does not appear to be retroactive, and that the court failed to consider whether the agreement bars the City from complying with the 1983 Consent Decree. The City does not present any serious counter-arguments in its brief in support of the district court's determination. In the absence of argument by the City, and of any detailed explanation by the district court as to the basis of its determination, we remand this portion of the district court's judgment as well.

In separate litigation arising in 1995, individuals challenged the City's hiring of employees in violation of the 1983 Consent Decree. The plaintiffs filed a motion requesting the court to address the threshold issue of whether the 1983 Consent Decree applied to personal service contract workers and temporary workers. After the court found the practice violated the 1983 Consent Decree, the City moved to vacate this ruling based on the decision in *Shakman II.* After oral argument in this case, the district court issued its order denying the motion to vacate. *See Shakman v. Democratic Org. of Cook County*, No. 69 C 2145, 2004 WL 691872 (N.D. Ill. Mar. 30, 2004). The City appealed, and the case is now pending in this court. *See Shakman v. City of Chicago*, No. 04-2105.

## II

## ANALYSIS

In this appeal, the plaintiffs submit that the district court erred in determining that they lacked standing to enforce the 1983 Consent Decree. They maintain that the issue of voter standing had been fully litigated when the City agreed to the 1983 Consent Decree; because the City took no further action to challenge the standing of voters, the City cannot now attack that decree for want of subject matter jurisdiction. The City argues, however, that before the plaintiffs can pursue their enforcement action, they must establish that they meet constitutional standing requirements. The City maintains that *Shakman II* makes it clear that voters do not have standing to challenge patronage hiring and promotional claims such as those that are the subject of the 1983 Consent Decree. Consequently, the City maintains, the plaintiffs do not have the necessary standing to invoke the power of the district court.

### A. Standing

The power of the judiciary is confined by Article III of the Constitution of the United States to "cases" and "controversies." U.S. Const. art. III, § 2; *see, e.g.*, *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992). As the Supreme Court has explained, through the pen of Chief Justice Warren in *Flast v. Cohen*, 392 U.S. 83, 95 (1968), this case and controversy requirement is often referred to as the concept of justiciability. Justiciability thus sets apart "cases" and "controversies"—disputes that "are appropriately resolved through the judicial process"—from those situations that are not properly resolved through the exercise of judicial authority. *Whitmore v. Arkansas*, 495 U.S. 149, 155 (1990).

Standing is an aspect of justiciability. "The 'gist of the question of standing' is whether the party seeking relief has 'alleged such a personal stake in the controversy as to assure that concrete adverseness which sharpens the presentation of issues upon which the court so largely depends for illumination of difficult constitutional questions.' " *Flast*, 392 U.S. at 99 (quoting *Baker v. Carr*, 369 U.S. 186, 204 (1962)). When determining standing, the emphasis "is on whether the party invoking federal court jurisdiction has 'a personal stake in the outcome of the controversy,' and whether the dispute touches upon the 'legal relations of the parties having adverse legal interests.' " *Id.* at 101 (quoting *Baker*, 369 U.S. at 204; *Aetna Life Ins. Co. v. Haworth*, 300 U.S. 227, 240-41 (1937)).

"Though some of its elements express merely prudential considerations that are part of judicial self-government, the core component of standing is an essential and unchanging part of the case-or-controversy requirement of Article III." *Lujan*, 504 U.S. at 560. Any plaintiff seeking to invoke the power of a federal court bears the burden of demonstrating: (1) an "injury in fact—an invasion of a legally protected interest which is (a) concrete and particularized, and (b) actual or imminent, not conjectural or hypothetical"; (2) a causal connection between the injury and the conduct complained of, that is, the injury is fairly traceable to the challenged action of the defendant, not the result of "the independent action of some third party not before the court"; and (3) a favorable decision likely will redress the injury. *Id.* at 560-61 (internal quotation marks, citations and footnotes omitted).

> In addition to constitutional standing requirements, the [s]tanding doctrine embraces several judicially imposed limits on the exercise of federal jurisdiction, such as the general prohibition on a litigant's raising another per-

son's legal rights, the rule barring adjudication of generalized grievances more appropriately addressed in the representative branches, and the requirement that a plaintiff's complaint fall within the zone of interests protected by the law invoked.

*Allen v. Wright*, 468 U.S. 737, 751 (1984). In other contexts, the Supreme Court and the courts of appeals have noted that prudential standing considerations often are especially important when individuals come to the federal courts to challenge the actions of a State. In those cases, federal courts have the added responsibility to ensure that their actions do not strain unnecessarily the principles of federalism. *Cf. Arizonans for Official English v. Arizona*, 520 U.S. 43, 75 (1997) (stating that "[w]hen anticipatory relief is sought in federal court against a state statute, respect for the place of the States in our federal system calls for close consideration of that core question"—"[i]s this conflict really necessary?"). For instance, concerns for federalism have been articulated frequently when state taxpayers have challenged an expenditure by the State. One of our sister circuits has explained that, in these situations, the separation of powers concern that animates the bar to generalized taxpayer suits

> has a counterpoint which should be considered when a state taxpayer seeks to have a federal court enjoin the appropriation and spending activities of a state government. Considerations of federalism should signal the same caution in these circumstances as concern for preservation of the proper separation of powers in an "all federal" action.

*Taub v. Kentucky*, 842 F.2d 912, 919 (6th Cir. 1988). In short, before permitting a plaintiff to challenge state governmental activity, the federal court has a duty to ensure, with careful attention, that the parties before it have the requisite concrete adverseness that will ensure full presentation of the

issues and avoid unnecessary intrusion into state governmental processes.

"Together, the constitutional and prudential components of standing ensure that plaintiffs possess 'such a personal stake in the outcome of the controversy as to assure that concrete adverseness which sharpens the presentation of issues upon which the court so largely depends for illumination of difficult constitutional questions.'" *Oregon Advocacy Ctr. v. Mink*, 322 F.3d 1101, 1109 (9th Cir. 2003) (quoting *Baker*, 369 U.S. at 204).

Recent cases illustrate how the Supreme Court and the courts of appeals have applied the concept of standing to ensure that the adversarial system works at its optimal level. In *Lujan*, for instance, members of wildlife conservation organizations challenged the Secretary of the Interior's promulgation of a regulation under the Endangered Species Act. The plaintiffs' asserted injury was "that the lack of consultation with respect to certain funded activities abroad 'increase[ed] the rate of extinction of endangered and threatened species.'" *Lujan*, 504 U.S. at 562 (quoting the plaintiffs' complaint). The Supreme Court held that, in order to establish standing, it was not enough for the organizations' members to have a "special interest" in wildlife conservation; instead, the challenged regulation had to affect "directly" one of the organization's members, apart from the stated special interest. *Id.* at 563. The Court stated that "[i]t goes beyond the limit, however, and into pure speculation and fantasy, to say that anyone who observes or works with an endangered species, anywhere in the world, is appreciably harmed by a single project affecting some portion of that species with which he has no more specific connection." *Id.* at 567. The Court also held that the provision of the Endangered Species Act that allowed for citizen enforcement was not a substitute for constitutional standing requirements:

"We have consistently held that a plaintiff raising only a generally available grievance about government— claiming only harm to his and every citizen's interest in proper application of the Constitution and laws, and seeking relief that no more directly and tangibly benefits him than it does the public at large—does not state an Article III case or controversy." *Id.* at 573-74.

The Court also has addressed voter standing to challenge governmental actions that impact the political process. In *United States v. Hays*, 515 U.S. 737 (1995), for example, voters in Louisiana brought an equal protection challenge to the State's redistricting plan. Before it could address the merits of the plaintiffs' claims, the Court was required to consider the plaintiffs' standing. The Court noted that, in light of the principles set forth in *Lujan*, "we have repeatedly refused to recognize a generalized grievance against allegedly illegal governmental conduct as sufficient for standing to invoke the federal judicial power" and that this rule applies "with as much force in the equal protection context as in any other." *Id.* at 743. The Court explained that only those individuals who claimed that they were "personally denied equal treatment" were in a position to challenge allegedly unconstitutional governmental action. *Id.* at 744 (internal quotation marks and citations omitted). Consequently, the Court had to "reject appellees' position that anybody in the State has a claim" if racial gerrymandering allegedly has occurred. *Id.* (internal quotation marks and citation omitted). Instead, the Court looked to whether the plaintiff had endured an individualized harm related to racial classification:

> Where a plaintiff resides in a racially gerrymandered district, . . . the plaintiff has been denied equal treatment because of the legislature's reliance on racial criteria, and therefore has standing to challenge the legislature's

action. Voters in such districts may suffer the special representational harms racial classifications can cause in the voting context. On the other hand, where a plaintiff does not live in such a district, he or she does not suffer those special harms, and any inference that the plaintiff has personally been subjected to a racial classification would not be justified absent specific evidence tending to support that inference. Unless such evidence is present, that plaintiff would be asserting only a general-ized grievance against governmental conduct of which he or she does not approve.

*Id.* at 744-45 (citations omitted). Thus, both *Lujan* and *Hays* emphasize that individuals challenging governmental ac-tions must have suffered a direct injury as a result of the allegedly unconstitutional action.

Our own cases examining voter standing in political patronage cases illustrate the other requirements set forth in *Lujan*—that the injury be fairly traceable to the allegedly illegal action and that the courts be able to redress the claimed injury. As we noted earlier, in *Shakman II* this court confronted the claim by Cook County officials that voters did not have standing to challenge political hiring decisions. When we evaluated the connection between the injury as-serted by the voters—the dilution of their voting strength—to the asserted illegal conduct—political patronage hiring—we concluded that the injury was not fairly traceable to the illegal conduct. We explained:

For each citizen, many factors, many not capable of articulation, will determine the nature and extent of that person's political activity. For those recruiting such political workers, political incumbency has advantages and disadvantages. In some political environments, a patronage hiring policy by the incumbents may enjoy a good deal of credibility with potential workers. Not

only may the incumbents be able to point to a successful political track record, but they may also be able to demonstrate their determination to implement such a policy by their present actions. Moreover, in many instances, although not always, the incumbent enjoys certain natural advantages in communicating with the citizenry. However, in other political environments, incumbency may well be a ball and chain on the leg of the candidate and the announcement of such a patronage policy may, far from being an advantage, seal his political doom. Indeed, it may be the challenger who can attract workers with the promise that, once elected, he will continue to seek the help of those who have supported him. We do not believe, therefore, that the plaintiffs can assert, with the certainty required by the case-and-controversy requirement, that the injury they assert is "fairly traceable" to the actions of the defendants that form the basis of their complaint.

*Shakman II*, 829 F.2d at 1397.

Later, in *Plotkin*, this court determined that voters did not have standing to pursue an injunction to bar governmental officials from receiving bribes that funded political campaigns. We stated:

The alleged injury-in-fact for these claims is that defendants' illegal conduct skewed the election results in favor of George Ryan and, in the process, diluted the impact of their votes. Plaintiffs concede that they cannot have the results of the 1998 gubernatorial election set aside by this suit, but ask for injunctive relief, findings of contempt, and the imposition of fines. . . .

. . . Plaintiffs make no allegations that the bribes-for-commercial drivers'-licenses scheme is continuing under Secretary White's administration, contending only that

> "[t]here exists in the Secretary of State's office a deep-seated culture and policy or custom of intertwining and requiring coerced partisan political work together with the official duties of the office," and as a result, "[t]here is a substantial likelihood that without remedial steps being taken that such or similar unlawful conduct will continue." These allegations are purely speculative.

*Plotkin*, 239 F.3d at 884-85 (internal citations omitted).

At its constitutional core, therefore, standing requires that the parties before the court must allege injury fairly traceable to the alleged illegal conduct of the defendant that the court may redress. This requirement necessitates an inquiry into the nature of the plaintiffs' injury, the connection between the injury and the complained-of actions and the scope of remedies available to the court.

Moreover, from a prudential standpoint, courts must pay particularly close attention to these requirements when they are asked to restrain the action of a public entity. When a plaintiff seeks to enjoin state governmental activity, "[c]ase-or-controversy considerations . . . 'obviously shade into those determining whether the complaint states a sound basis for equitable relief.' The latter set of considerations should therefore inform our judgment about whether [the plaintiffs] have standing." *Allen*, 468 U.S. at 760-61 (quoting *O'Shea v. Littleton*, 414 U.S. 488, 499 (1974)). And, voters, taxpayers or residents voicing generalized complaints are not sufficient to justify the federal courts' intrusion into the workings of the States.

**B. Finality**

The plaintiffs in the present action acknowledge the requirements for standing. They maintain, however, that these standards are largely irrelevant to their action because standing for this action is provided by the 1983 Consent

Decree. In their view, the City's failure to challenge the jurisdictional determination of the district court on which the 1983 Consent Decree was based is fatal to the City's current claim that the court lacks jurisdiction to enforce the decree. The plaintiffs' argument rests largely on a line of cases originating with *Swift & Co. v. United States*, 276 U.S. 311 (1928) ("*Swift I*"), in which the Supreme Court and the courts of appeals have refused to permit collateral attacks on the subject matter jurisdiction of the court.

One of the first cases to speak to attempts to relitigate subject matter jurisdiction in a collateral proceeding, as noted above, was *Swift I*. In *Swift I*, the Government had instituted an antitrust action against five leading meat-packing companies. In their answers, the defendants denied the material allegations of the complaint. Along with the answers, the defendants filed a stipulation "which provided that the court might, without finding any fact, enter the proposed decree therein set forth." *Id.* at 320. "The decree declared among other things, that the court had jurisdiction of the persons and the subject-matter, and 'that the allegations of the petitioner state a cause of action against the defendants under the provisions of the Sherman Anti-Trust Act and supplementary legislation.'" *Id.* (quoting the proposed decree). The court entered the proposed decree. Only two years later, parties to the decree moved to vacate the consent decree on the ground that it was void for reasons including the district court's lack of jurisdiction. Specifically, the defendants contended that there was "no case or controversy within the meaning of section 2 of article 3 of the Constitution." *Id.* at 325. The Court rejected this argument:

> The defendants concede that there was a case at the time when the government filed its petition and the defen-

dants their answers; but they insist that the controversy
had ceased before the decree was entered. . . . The
argument ignores the fact that a suit for an injunction
deals primarily, not with past violations, but with
threatened future ones; and that an injunction may issue
to prevent future wrong, although no right has yet been
violated. Moreover, the objection is one which is not
open on a motion to vacate. The court had jurisdiction
both of the general subject-matter-enforcement of the
Anti-Trust Act—and of the parties. If it erred in decid-
ing that there was a case or controversy, the error is one
which could have been corrected only by an appeal or
by a bill of review. On a motion to vacate, the determi-
nation by the Supreme Court of the District that a case
or controversy existed is not open to attack.

*Id.* at 326 (citations omitted).

Two other Supreme Court cases followed closely on the
heels of *Swift I* and, although arising in different factual
contexts, reiterated *Swift I*'s general holding. In *Stoll v.
Gottlieb*, 305 U.S. 165 (1938), the Court rejected a collateral
attack on the district court's jurisdiction in adjudicating a
bankruptcy. At issue in *Stoll* was the validity of a release of
a guarantee granted by the district court acting pursuant to
the authority of the Bankruptcy Act of 1934. The release
later was challenged and, eventually, upheld by the Supreme
Court against attack. The Court stated:

Where adversary parties appear, a court must have the
power to determine whether or not it has jurisdiction of
the person of a litigant, or whether its geographical
jurisdiction covers the place of the occurrence under
consideration. . . . An erroneous affirmative conclusion
as to the jurisdiction does not in any proper sense en-
large the jurisdiction of the court until passed upon by
the court of last resort, and even then the jurisdiction
becomes enlarged only from the necessity of having a

> judicial determination of the jurisdiction over the sub-
> ject matter. When an erroneous judgment, whether from
> the court of first instance or from the court of final
> resort, is pleaded in another court or another jurisdic-
> tion the question is whether the former judgment is res
> judicata. After a Federal court has decided the question
> of the jurisdiction over the parties as a contested issue,
> the court in which the plea of res judicata is made has
> not the power to inquire again into that jurisdictional
> fact. We see no reason why a court in the absence of an
> allegation of fraud in obtaining the judgment, should
> examine again the question whether the court making
> the earlier determination on an actual contest over ju-
> risdiction between the parties, did have jurisdiction of
> the subject matter of the litigation. In this case the order
> upon the petition to vacate the confirmation settled the
> contest over jurisdiction.

*Id.* at 171-72 (footnotes omitted).

Similarly, in *Chicot County Drainage District v. Baxter State Bank*, 308 U.S. 371 (1940), a holder of a municipal bond sought to challenge a reorganization decree on the ground that the decree was issued pursuant to a statute that later was declared invalid by another district court. The Supreme Court characterized the bond-holders' jurisdictional argument as "untenable." *Id.* at 376. The Court explained:

> The argument is pressed that the District Court was
> sitting as a court of bankruptcy, with the limited ju-
> risdiction conferred by statute, and that, as the statute
> was later declared to be invalid, the District Court was
> without jurisdiction to entertain the proceeding and
> hence its decree is open to collateral attack. We think the
> argument untenable. The lower federal courts are all
> courts of limited jurisdiction, that is, with only the
> jurisdiction which Congress has prescribed. But none

the less they are courts with authority, when parties are brought before them in accordance with the requirements of due process, to determine whether or not they have jurisdiction to entertain the cause and for this purpose to construe and apply the statute under which they are asked to act. Their determinations of such questions, while open to direct review, may not be assailed collaterally.

. . . The court has the authority to pass upon its own jurisdiction and its decree sustaining jurisdiction against attack, while open to direct review, is res judicata in a collateral action.

*Id.* at 376-77 (citations omitted).

Summarizing these, and other more recent cases, one treatise has concluded that "it seems clear that a federal court judgment is binding notwithstanding a simple lack of subject matter jurisdiction, without regard to whether the jurisdictional question was litigated or appealed." 18A Charles Allen Wright & Arthur R. Miller, *Federal Practice and Procedure* § 4428 at 23 (2d ed. 2002). Our own court has phrased the rule accordingly: "After a case has become final by exhaustion of all appellate remedies, only an egregious want of jurisdiction will allow the judgment to be undone by someone who, having participated in the case, cannot complain that his rights were infringed without his knowledge." *In re Factor VIII*, 159 F.3d 1016, 1019 (7th Cir. 1998).

## C. Modification of the Decree

The City's argument, however, encompasses more than simply an attack on the district court's subject matter jurisdiction over the plaintiffs at the time the 1983 decree was entered. The City primarily argues that it is *not* "attacking the 1983 decree but rather the plaintiffs' ability to invoke federal jurisdiction," Appellee's Br. at 36-37, specifically, the

plaintiffs' lack of standing to bring this enforcement action. In support of this argument, the City draws upon cases discussing the nature of, or proposed modifications to, consent decrees. We review these cases below.

One of the cases on which the City relies most heavily is *Local Number 93, International Association of Firefighters, AFL-CIO v. City of Cleveland*, 478 U.S. 501 (1986). In that case, the union representing Cleveland firefighters objected to a consent decree that obligated the City of Cleveland to adopt race-conscious measures to correct past discrimination. The Supreme Court concluded that the "voluntary adoption in a consent decree of race-conscious relief that may benefit nonvictims" did not violate the Civil Rights Act of 1964. *Id.* at 525. Similarly, the Court rejected the notion that there was some "independent judicial canon or 'common law' of consent decrees" that prevented courts from entering a consent decree that a court itself could not order had the matter gone to trial. *Id.* The Court explained that

> a federal court is more than "a recorder of contracts" from whom parties can purchase injunctions; it is "an organ of government constituted to make judicial decisions. . . ." 1B J. Moore, J. Lucas, & T. Currier, Moore's Federal Practice ¶ 0.409[5], p. 331 (1984). . . . Accordingly, a consent decree must spring from and serve to resolve a dispute within the court's subject-matter jurisdiction. Furthermore, consistent with this requirement, the consent decree must "com[e] within the general scope of the case made by the pleadings," *Pacific R. Co. v. Ketchum*, 11 Otto 289, 297, 101 U.S. 289, 297, 25 L.Ed. 932 (1880), and must further the objectives of the law upon which the complaint was based. However, in addition to the law which forms the basis of the claim, the parties' consent animates the legal force of a consent decree. . . . Therefore, a federal court is not necessarily

> barred from entering a consent decree merely because the decree provides broader relief than the court could have awarded after a trial.

*Id.* at 525 (citations omitted).

In support of its argument that the plaintiffs lacked standing, the City also draws upon cases involving the modification of consent decrees. We begin our discussion by focusing on an opinion that concerned the continuation of the decree at issue in *Swift I*. After unsuccessfully attempting to vacate the consent decree to which the defendant meat-packers voluntarily had entered, a few of the defendants moved to modify the decree. *See United States v. Swift & Co.*, 286 U.S. 106, 112 (1932) ("*Swift II*"). The Supreme Court, although it had been firm in its discussion of the ability to relitigate jurisdiction, readily acknowledged the power of the courts to modify a decree: "We are not doubtful of the power of a court of equity to modify an injunction in adaptation to changed conditions, though it was entered by consent." *Id.* at 114. Indeed, "[p]ower to modify the decree was reserved by its very terms, and so from the beginning went hand in hand with its restraints. If the reservation had been omitted, power there still would be by force of principles inherent in the jurisdiction of the chancery." *Id.* The critical consideration for the Court was whether need for a change existed:

> A continuing decree of injunction directed to events to come is subject always to adaptation as events may shape the need. The distinction is between restraints that give protection to rights fully accrued upon facts so nearly permanent as to be substantially impervious to change, and those that involve the supervision of changing conduct or conditions and are thus provisional and tentative. The result is all one whether the decree has been entered after litigation or by consent. In either event, a court does not abdicate its power to

> revoke or modify its mandate, if satisfied that what it has been doing has been turned through changing circumstances into an instrument of wrong. We reject the argument for the interveners that a decree entered upon consent is to be treated as a contract and not as a judicial act. . . . The consent is to be read as directed toward events as they then were. It was not an abandonment of the right to exact revision in the future, if revision should become necessary in adaptation to events to be.

*Id.* at 114-15 (citations omitted). Despite this reference to flexibility, however, the Court concluded that "[n]othing less than a clear showing of grievous wrong evoked by new and unforeseen conditions should lead us to change what was decreed after years of litigation with the consent of all concerned." *Id.* at 119.

Later cases, however, have warned that this rather intransigent language must be read in the broader factual context presented by the *Swift II* case: "Our decisions since *Swift [II]* reinforce the conclusion that the 'grievous wrong' language of *Swift [II]* was not intended to take on a talismanic quality, warding off virtually all efforts to modify consent decrees." *Rufo v. Inmates of the Suffolk County Jail*, 502 U.S. 367, 380 (1992). *Swift II*, the Court explained, "pointedly distinguished the facts of that case from one in which genuine changes required modification of a consent decree." *Id.* at 379. Indeed, in *Rufo* the Court noted that the standard for modification of consent decrees, now set forth in Federal Rule of Civil Procedure 60(b), is a "flexible" one.[3]

---

[3] Rule 60(b) provides, in relevant part:

On motion and upon such terms as are just, the court may
(continued...)

It further explained why such flexibility was necessary:

> The upsurge in institutional reform litigation since *Brown v. Board of Education*, 347 U.S. 483 (1955), has made the ability of a district court to modify a decree in response to changed circumstances all the more important. Because such decrees often remain in place for extended periods of time, the likelihood of significant changes occurring during the life of the decree is increased.

*Id.* at 380. Furthermore, the Court noted that "the public interest is a particularly significant reason for applying a flexible modification standard in institutional reform litigation because such decrees 'reach beyond the parties involved directly in the suit and impact on the public's right to the sound and efficient operation of its institutions.'" *Id.* at 381 (quoting *Heath v. DeCourcy*, 888 F.2d 1105, 1109 (6th Cir. 1989)). Thus, a party seeking modification of a consent decree does not have to prove a "grievous" wrong of the kind required in *Swift*; the party only "bears the burden of establishing that a significant change in circumstances warrants revision of the decree." *Id.* at 383.

This initial burden may be met "by showing either a significant change either in factual conditions or in law." *Id.* at 384. "While a decision that clarifies the law will not, in and of itself, provide a basis for modifying a decree, it could

---

[3]  (...continued)
relieve a party or a party's legal representative from a final judgment, order, or proceeding for the following reasons: . . . (5) the judgment has been satisfied, released, or discharged, or a prior judgment upon which it is based has been reversed or otherwise vacated, or it is no longer equitable that the judgment should have prospective application . . . .

constitute a change in circumstances that would support modification if the parties had based their agreement on a misunderstanding of the governing law." *Id.* at 390.

If the moving party meets this standard, a district court should consider whether the proposed modification is "suitably tailored to the changed circumstance." *Id.* at 383. A proposed modification, the Court stated, "must not create or perpetuate a constitutional violation." *Id.* at 391. However, neither should a court "strive to rewrite a consent decree so that it conforms to the constitutional floor"; instead, "the focus should be on whether the proposed modification is tailored to resolve the problems created by the change in circumstances." *Id.* Within these constraints, due deference must be given to the local bodies that implement the decree as well as administer the laws for the common good:

> [T]he public interest and "[c]onsiderations based on the allocation of powers within our federal system," [*Board of Education of Oklahoma City Public Schools v. Dowell*, 498 U.S. 237, 248 (1991)], require that the district court defer to local government administrators, who have the "primary responsibility for elucidating, assessing, and solving" the problems of institutional reform, to resolve the intricacies of implementing a decree modification. *Brown v. Board of Education,* 349 U.S. 294, 299 (1955). Although state and local officers in charge of institutional litigation may agree to do more than that which is minimally required by the Constitution to settle a case and avoid further litigation, a court should surely keep the public interest in mind in ruling on a request to modify based on a change in conditions making it substantially more onerous to abide by the decree. To refuse modification of a decree is to bind all future officers of the State, regardless of their view of the necessity of relief from one or more provisions of a decree that

might not have been entered had the matter been litigated to its conclusion. . . . Financial constraints may not be used to justify the creation or perpetuation of constitutional violations, but they are a legitimate concern of government defendants in institutional reform litigation and therefore are appropriately considered in tailoring a consent decree modification.

*Id.* at 392-93 (citations, parallel citations and footnote omitted).

The Court then summarized its holding:

[T]he *Swift* "grievous wrong" standard does not apply to requests to modify consent decrees stemming from institutional reform litigation. Under the flexible standard we adopt today, a party seeking modification of a consent decree must establish that a significant change in facts or law warrants revision of the decree and that the proposed modification is suitably tailored to the changed circumstance. . . .

*Id.* at 393.[4]

---

[4] The plaintiffs suggest that the Supreme Court's decision in *Kokkonen v. Guardian Life Insurance Company of America*, 511 U.S. 375 (1994), somehow increases a party's burden in seeking modification of a consent decree pursuant to Rule 60(b). We disagree. *Kokkonen* concerned an attempt to enforce a settlement agreement between two private parties. The terms of the agreement were not entered as part of a consent decree:

[T]he only order here was that the suit be dismissed, a disposition that is in no way flouted or imperiled by the alleged breach of the settlement agreement. The situation would be quite different if the parties' obligation to comply with the terms of the settlement agreement had been made part of the
(continued...)

We have had occasion to apply the standards set forth in *Rufo* to cases that have come before this court. In *Evans v. City of Chicago*, 10 F.3d 474 (7th Cir. 1993) (en banc), we considered a consent decree that required the City of Chicago to pay its tort judgments in a particular sequence. The City moved to vacate that decree pursuant to Rule 60(b). A plurality of the en banc court believed that the outcome of the case was dictated by the public nature of the litigation. The plurality explained that, when courts are asked to modify a consent decree involving a governmental entity, they

> are bound by principles of federalism (and by the fundamental differences between judicial and political branches of government) to preserve the maximum leeway for democratic governance. Over the last decade a series of decisions in this circuit has emphasized the district court's responsibility to identify the rule of federal law supporting a consent decree binding the political arms of government, and the corresponding obligation to permit new public officials to set their own policy within the limits established by federal law.

---

[4] (...continued)
> order of dismissal—either by separate provision (such as a provision "retaining jurisdiction" over the settlement agreement) or by incorporating the terms of the settlement agreement in the order. In that event a breach of the agreement would be a violation of the order, and ancillary jurisdiction to enforce the agreement would therefore exist. That, however, was not the case here. The judge's mere awareness and approval of the terms of the settlement agreement do not suffice to make them part of his order.

*Id.* at 380-81. Unlike the situation in *Kokkenen*, the 1983 Consent Decree was entered as the judgment of the court and also specifically provided for continuing enforcement jurisdiction for the district court.

*Id.* at 479. The plurality then concluded that

> [a]ll of these cases illustrate the principle we recognize today: entry and continued enforcement of a consent decree regulating the operation of a governmental body depend on the existence of a substantial claim under federal law. Unless there is such a claim, the consent decree is no more than a contract, whose enforcement cannot be supported by the diversity jurisdiction and that has in court no more force than it would have outside the court.

*Id.* at 480.[5]

Not long after *Evans*, we decided two other cases pertinent to the present discussion—*Komyatti v. Bayh*, 96 F.3d 955 (7th Cir. 1996), and *David B. v. McDonald*, 116 F.3d 1146 (7th Cir. 1997). In *Komyatti*, Indiana prisoners filed a class action against state prison officials in which they alleged that certain conditions of their confinement violated the Constitution. The parties negotiated a settlement, "which, by incorporating an Indiana statutory provision, accord[ed] prisoners . . . certain procedural protections, including the availability of a 'lay advocate,' during the disciplinary pro-

---

[5] One member of the court, concurring in the judgment, stated that,

> [f]or the present, it is sufficient to conclude that this court's decision in *Evans v. City of Chicago*, 873 F.2d 1007 (7th Cir. 1989) (*Evans II*), changed the prevailing law to such a degree as to make further enforcement of the consent decree by the district court inappropriate under the standards set forth by the Supreme Court in *Rufo v. Inmates of the Suffolk County Jail* . . . .

*Evans v. City of Chicago*, 10 F.3d 474, 483 (1993) (Ripple, J., concurring).

cess." *Komyatti*, 96 F.3d at 956. Two years later, prisoners filed a motion to hold the state in contempt for violating the decree. The district court refused to enforce the provisions of the consent decree because it believed that the decree required the State to comply with state law in violation of the Eleventh Amendment. *Id.*

This court disagreed with the district court that enforcement of the decree created an Eleventh Amendment problem. Nevertheless, the court acknowledged that "[t]here may indeed be instances when significant factual or legal changes make it inequitable for a court to continue to enforce a settlement decree. When such circumstances occur, the parties may . . . seek an alteration in the terms of the consent decree pursuant to Federal Rule of Civil Procedure 60(b)(5)." *Id.* at 962 (footnote omitted). We identified the specific errors made by the district court and gave it detailed instructions to be followed on remand:

> The district court erred in several respects. First, it should not have held that the proper course for the state officials was to ignore the provision with impunity. The appropriate course . . . would have been to seek an alteration of the decree from the district court. Secondly, the district court assumed that the court could not retain, and enforce through its contempt power, any provision of the consent decree that could not be characterized as required by the Constitution itself. In this respect, it failed to recognize that a federal consent decree can contain a provision not explicitly required by the Constitution as long as the criteria set forth in *Firefighters* are met. The mere congruence of the selected terms with a provision of state law does not, standing alone, render the consent decree beyond the authority of the federal court. Rather, the selection of that term must be measured against the criteria of *Firefighters*. "If

a federal court can validly enter a consent decree, it can surely enforce that decree." If intervening legal or factual changes make enforcement inequitable, Rule 60 provides an effective remedy.

*Id.* at 963-64 (quoting *Kozlowski v. Coughlin*, 871 F.2d 241, 244 (2d Cir. 1989); internal citations and footnote omitted).

Finally, in *David B.*, this court again discussed the standard for modifying a consent decree. In that case, the heads of three Illinois agencies had signed a consent decree promising to provide "appropriate" services to the state's youth that were in need of "specialized services." *David B.*, 116 F.3d at 1147. Over a decade later, "the legislature of Illinois enacted a statute curtailing" the authority of one of the agencies "to provide services to children over the age of 13 who ha[d] been adjudicated 'delinquent.' " *Id.* The agency perceived these as inconsistent obligations and petitioned the court "to be relived of any duty to provide services to delinquents over the age of 13." *Id.* The district court refused to modify the decree on the ground that there had not been a change in federal law that rendered the decree inequitable. We reversed.

We noted initially that it might be possible to reconcile the decree and the statute. However, assuming that the decree required the agency "to take custody of some persons over the age of 13 who have been adjudicated delinquent," "[t]hen the decree should be modified to eliminate the conflict between its requirements and the new statute." *Id.* at 1148-49. We stated that, in *Rufo*, on which the district court had relied, "[t]he Court did not distinguish between legal and factual circumstances, or between state and federal law; change in any of these things may justify a modification under Fed. R. Civ. P. 60(b)(5)." *Id.* at 1149. Thus, the change in state law certainly could justify the modification sought.

We then turned to the task of the district court on remand. We noted that our past cases had emphasized that consent decrees must be based on substantial federal claims, and, although the lack of such a claim "does not permit a party to disregard the decree, . . . it does justify modification or vacatur." *Id.* at 1150 (citing *Komyatti*, 96 F.3d at 962-63). The court instructed the district court that

> [i]t must either construe or modify the decree forthwith to permit Illinois to reallocate tasks among its agencies and to reduce the services offered to persons adjudicated delinquent. Then it must determine whether a substantial federal claim supports the decree as a whole; if not, the entire decree must be lifted and the task of shaping public policy be restored to persons today holding political office—subject only to whatever limitations federal law and the Supremacy Clause now place on the operation of the state's social-welfare system.

*Id.*

Our discussion of modification and enforcement of consent decrees would not be complete without mention of *Frew v. Hawkins*, 124 S. Ct. 899 (2004), handed down after arguments were heard in the present case. In *Frew*, the Court considered "whether the Eleventh Amendment bars *enforcement* of a federal consent decree entered into by state officials." 124 S. Ct. at 901 (emphasis added). Specifically, state officials argued that "a federal court should not enforce a consent decree arising from an *Ex parte Young* suit unless the court first identifies, at the enforcement stage, a violation of federal law." *Id.* at 904. The Court rejected this argument and held that the Eleventh Amendment does not act as a bar to an enforcement action to a consent decree the initial entry of which was consistent with *Ex parte Young*, 209 U.S. 123 (1908), and *Firefighters*. The Court also commented on the state officials' fear "that enforcement of consent decrees

c[ould] undermine the sovereign interests and accountabil-
ity of state governments." *Id.* at 905. The Court acknowl-
edged that

> [i]f not limited to reasonable and necessary implementa-
> tions of federal law, remedies outlined in consent
> decrees involving state officeholders may improperly
> deprive future officials of their designated legislative
> and executive powers. They may also lead to federal
> court oversight of state programs for long periods of
> time even absent an ongoing violation of federal law.

*Id.* In such circumstances, the Court stated, the States are not
without remedy; it explained:

> When a suit under *Ex parte Young* requires a detailed
> order to ensure compliance with a decree for prospec-
> tive relief, and the decree in effect mandates the State,
> through its named officials, to administer a significant
> federal program, principles of federalism require that
> state officials with front-line responsibility for adminis-
> tering the program be given latitude and substantial
> discretion.
>
>     The federal court must exercise its equitable powers
> to ensure that when the objects of the decree have been
> attained, responsibility for discharging the State's obli-
> gations is returned promptly to the State and its offi-
> cials. As public servants, the officials of the State must
> be presumed to have a high degree of competence in
> deciding how best to discharge their governmental re-
> sponsibilities. A State, in the ordinary course, depends
> upon successor officials, both appointed and elected, to
> bring new insights and solutions to problems of allo-
> cating revenues and resources. The basic obligations of
> federal law may remain the same, but the precise manner
> of their discharge may not. If the State establishes
> reason to modify the decree, the court should make the

> necessary changes; *where it has not done so, however, the decree should be enforced according to its terms*.

*Id.* at 906 (emphasis added).

From these cases, it is clear that there are important differences between a consent decree involving a one-time adjudication among private parties and one that includes an injunction restricting the ability of a State or local government to meet its responsibilities. In the latter case, there is a need to ensure that changes in factual or legal circumstances do not transform a once-just result into one that is unjust, illegal or overly burdensome and do not unnecessarily hinder a State in providing for the welfare of its citizenry. Although changes in the factual or legal predicates on which a consent decree is based are not grounds for ignoring or defying the decree, *see Frew*, 124 S. Ct. at 906; *Komyatti*, 96 F.3d at 963 ("[W]e believe that the court expressed the usual course . . . when it wrote that a 'continuing respect for the valid decrees of a court commands that they be obeyed until changed.'" (quoting *Kindred v. Duckworth*, 9 F.3d 638, 644 (7th Cir. 1993))), Rule 60(b) does provide an avenue for modification of a consent decree. As articulated by the Court in *Rufo*, Rule 60(b) is a "flexible standard" according to which "a party seeking modification of a consent decree must establish that a significant change in facts or law warrants revision of the decree and that the proposed modification is suitably tailored to the changed circumstance." 502 U.S. at 393.[6]

---

[6] A district court need not wait for the parties explicitly to request such changes; "the court can on its own motion vacate"—or modify—"the decree pursuant to Rule 60(b)(5)." *United States v. Bd. of Educ. of Chicago*, 799 F.2d 281, 297 (7th Cir. 1986).

### D. Application

As we noted earlier, the parties each emphasize a different line of cases in presenting their arguments. The plaintiffs maintain that the district court erred in addressing the question of standing because relitigation of the standing issue is barred by *Swift I*. There is no question that *Swift I* has some application here. In the *Shakman* litigation that led to the 1983 Consent Decree, the City maintained that the voters lacked constitutional standing to challenge hiring and promotional practices, but the district court determined that, adhering to our decision in *Shakman I*, the plaintiffs had standing. *See Shakman*, 481 F. Supp. at 1328-29. The City took no appeal from this ruling. Under such circumstances, when a federal court "has decided the question of the jurisdiction over the parties as a contested issue, the court in which the plea of res judicata is made has not the power to inquire again into that jurisdictional fact." *Stoll*, 305 U.S. at 172. Thus, as this court has stated, only "an egregious want of jurisdiction" will justify reconsideration of the standing issue. *In re Factor VIII*, 159 F.3d at 1018.

The City does not argue that there was an "egregious want of jurisdiction" in 1979, when the district court, adhering to our ruling in *Shakman I*, found that the *Shakman* plaintiffs had standing to pursue their hiring claims. Nor does the City argue that there was an egregious want of jurisdiction when the 1983 Consent Decree was entered. It does, however, point to language in *Firefighters* that, "at a minimum, 'a consent decree must spring from and serve to resolve a dispute within the court's subject matter jurisdiction.'" Appellee's Br. at 20 (quoting *Firefighters*, 478 U.S. at 525). Furthermore, the City contends that, because *Shakman II* "makes plain [that] there was no case or controversy within the district court's jurisdiction when it entered the

1983 decree," "the decree is itself without jurisdictional support." *Id.*[7]

Contrary to the City's contention, this court in *Shakman II* did *not* determine that the district court's 1979 standing ruling misapplied the law of standing as the concept was understood in 1979. Instead, we explained that

> we are confronted with a significantly different *legal* landscape than the one that confronted the district court at the time the complaint was originally filed in 1969, at the time of the first appeal to this court in 1970, or at the time that the district court made the ruling now before us in 1979. During these intervening years, the Supreme Court has engaged in a thorough examination of "justiciability," the limitations imposed on federal courts by the "case-and-controversy" provision of article III.

*Shakman II*, 829 F.3d at 1393 (emphasis in original). Furthermore, it was not because of any initial error by the district court, but because of "these *changes*" that we were not "able to regard the earlier holding of a panel of this court . . . as having the precedential effect that we would normally accord such an earlier ruling of this court in the same litigation." *Id.* at 1393 (emphasis added).[8] Thus, at the time that

---

[7] The City also attempts to distinguish *Swift* on its facts. *See* Appellees' Br. at 37 n.10.

[8] As explained in detail earlier in this opinion, our decision in *Shakman II* was a result of an appeal taken by Cook County defendants in the ongoing *Shakman* litigation. Thus, although our decision in *Shakman II* required us to confront the law-of-the-case doctrine, namely the deference owed to a prior decision of a court in the *same* litigation, in *Shakman II* we did not have to con-

(continued...)

the district court issued its 1979 order (on which the 1983 Consent Decree was based) the voter-plaintiffs had standing, and the "dispute [was] within the court's subject matter jurisdiction." *Firefighters*, 478 U.S. at 525.

The crux of the City's argument is that the same changes that required our reconsideration of standing in *Shakman II* bar the present action by voters to enforce the 1983 Consent Decree. Namely, the courts have articulated, with new clarity, the requirement that, in order to have standing, the plaintiffs must articulate a direct and palpable injury, different from any injuries suffered by a member of the general public, which is directly traceable to the defendants' illegal conduct. As applied to political patronage cases, we have held that a voter's diminished political voice is not directly traceable to political patronage hiring such that constitutional standing requirements are met; in *Shakman II*, we stated:

> In this case, we find the line of causation between the appellants' activity and the appellees' asserted injury to be particularly attenuated. As in the foregoing cases, the line of causation depends upon countless individual decisions. Moreover, those countless individual decisions must depend upon, according to the appellees' own theory of the case, countless individual political assessments that those who are in power will stay in power. It is not the hiring policy itself which creates any advantage for the incumbents. Any other candidate is entirely free to assert that, if elected, he will follow the same policy. Any advantage obtained by the incumbent

---

[8] (...continued)
sider—as we do in the present action—the preclusive effect of a judgment in a *prior*, completed litigation.

> is obtained only if potential workers make an independent evaluation that the incumbent, and not the opposition, will win. The plaintiffs will be at a disadvantage if—and only if—a significant number of individuals seeking political job opportunities determines the "ins" will remain the "ins."

*Shakman II,* 829 F.2d at 1397. Because "[f]or each citizen, many factors, many not capable of articulation, will determine the nature and extent of the person's political activity"— only one of which is the potential for future employment or promotion, we concluded in *Shakman II* that voters could not assert "with the certainty required by the case-and-controversy requirement" that the injury to their political voice was " 'fairly traceable' to the actions of the defendants that form the basis of their complaint." *Id.* Given these holdings, the City maintains that the present plaintiffs do not have standing to enforce the present action.

The problem with the City's present position is that it ignores the procedural posture of this case. The present plaintiffs brought an action to *enforce* the 1983 Consent Decree, and the district court had the power to enforce that decree: " '[F]ederal courts are not reduced to approving consent decrees and hoping for compliance. Once entered, a consent decree may be enforced.' " *Frew,* 124 S. Ct. at 905 (quoting *Hutto v. Finney,* 437 U.S. 678, 690-91 (1978)). A party may not simply ignore the decree because it believes that factual or legal changes since the decree's entry renders continued enforcement illegal or inequitable. Rather, Rule 60(b)provides an avenue to seek relief from some or all of the requirements of the original decree.

It should be clear, therefore, from the above discussion, that we believe that the district court's judgment in this case must be reversed. The decision suffers from some of the same infirmities found in the judgment of the district court

that we reversed in *Komyatti.* There, a district court had refused to enforce a consent decree based on constitutional decisions handed down after the initial entry of the decree. In *Komyatti,* we explained that the state defendants could not simply ignore the consent decree but should seek modification of the decree pursuant to Rule 60. We believe the same course should be followed here.

On remand, assuming the City wishes to pursue the issue, the focus of the district court shall be not on the law of standing as a jurisdictional concept but on the equitable standards embodied in Rule 60(b)(5). *Cf. Frew,* 124 S. Ct. at 906 (holding that the equitable standards of Rule 60, not the rule of *Ex parte Young,* 209 U.S. 123, govern the modification of a consent decree). The district court should consider critically whether changes in the legal landscape since 1983 require modification or vacatur of that decree pursuant to Rule 60(b). Specifically, the cases outlined above reveal two important developments that should guide the district court's analysis. First, *Rufo* and circuit court decisions in its wake emphasize the need for district courts to take a flexible approach to proposed modifications of consent decrees that bind public entities: "[T]he public interest and '[c]onsiderations based on the allocation of powers within our federal system' require that the district court defer to local government administrators who have the 'primary responsibility for elucidating, assessing, and solving' the problems of institutional reform, to resolve the intricacies of implementing a decree modification." *Rufo,* 502 U.S. at 392 (quoting *Dowell,* 498 U.S. at 248; *Brown,* 349 U.S. at 299). In short, concerns of federalism should factor strongly into the court's analysis.

Second, the court must consider the significant changes in the law of voter standing since the entry of the 1983 Consent Decree. As *Shakman II* makes clear, we have serious concerns whether the plaintiffs as voters bring to the litigation the

sort of concrete adverseness to fulfill the mandate of *Lujan*. The court should consider whether the class of voters has the "incentive to vigorously litigate and present the matter [of political patronage] to the court in the manner best suited for judicial resolution." Erwin Chemerinsky, *Federal Jurisdiction* § 2.3.2 (2003). Even given the vitality of *Swift* and its progeny, a decree fashioned in litigation in which one of the litigants did not have a sufficient concrete stake in the outcome might contain provisions that are not worthy of continued enforcement by a federal court. If the City "establishes reason to modify the decree, the court should make the necessary changes; where it has not done so, however, the decree shall be enforced according to its terms." *Frew*, 124 S. Ct. at 906.

## Conclusion

For the foregoing reasons, the judgment of the district court is reversed, and the case is remanded for further proceedings consistent with this opinion. The parties shall bear their own costs in this appeal.

REVERSED and REMANDED

A true Copy:

Teste:

_____

*Clerk of the United States Court of*
*Appeals for the Seventh Circuit*