In the

# United States Court of Appeals
## For the Seventh Circuit

———————

No. 04-2105

MICHAEL L. SHAKMAN and
PAUL M. LURIE,

*Plaintiffs-Appellees*,

*v.*

CITY OF CHICAGO,

*Defendant-Appellant*.

———————

Appeal from the United States District Court
for the Northern District of Illinois, Eastern Division.
No. 69 C 2145—**Wayne R. Andersen**, *Judge.*

———————

ARGUED APRIL 14, 2005—DECIDED OCTOBER 24, 2005

———————

Before COFFEY, RIPPLE and KANNE, *Circuit Judges*.

RIPPLE, *Circuit Judge.* The City of Chicago ("City") filed a motion to vacate a consent decree entered in 1983 to settle political patronage litigation originally instituted in 1969. The district court denied the City's motion to vacate, and the City appealed. For the reasons set forth in the following opinion, we reverse the judgment of the district court and remand for further proceedings consistent with this opinion.

**I**

**BACKGROUND**

**A. Facts**

The basic facts underlying the present appeal have been recounted in this court's earlier decisions, *see, e.g., Shakman v. Democratic Org.*, 435 F.2d 267 (7th Cir. 1970) ("*Shakman I*"); *Shakman v. Dunne*, 829 F.2d 1387 (7th Cir. 1987) ("*Shakman II*"); *O'Sullivan v. City of Chicago*, 396 F.3d 843 (7th Cir. 2005); we assume general familiarity with those cases and recount here only those facts essential to an understanding of the present appeal.

**1. The Original *Shakman* Litigation**

In 1969, Michael Shakman was an independent candidate seeking election to the Illinois Constitutional Convention. He and one of his supporters brought suit on behalf of themselves, other candidates and voters against several governmental entities and officials, including the City of Chicago and its Mayor. The class alleged that the defendants maintained a patronage system under which government employment decisions—both hiring and retention—were based on the prospective (or current) employees' support of Democratic candidates. According to Mr. Shakman, this system violated the right of a candidate to associate with supporters, the right of voters to a free electoral process and the right of public employees to associate with candidates from other parties.

The district court dismissed the complaint for lack of standing; we reversed. We held that this "misuse of official power over public employees . . . create[d] a substantial, perhaps massive, political effort in favor of the ins and

against the outs." *Shakman I*, 435 F.2d at 270. We concluded that "these interests are entitled to constitutional protection from injury of the nature alleged as well as from injury resulting from inequality in election procedure." *Id.* Following the remand, the City agreed to a consent judgment, and such a decree was entered on May 5, 1972 ("1972 Consent Decree"). *See* R.174, Ex.4.

The 1972 Consent Decree prohibited the City from considering political activity or affiliation when making employment decisions concerning *current* employees. The district court retained jurisdiction to clarify and to enforce the provisions of the decree. The decree did not address whether political affiliation and activity could be considered in hiring *new* employees—a matter that continued to be litigated by the parties.

Litigation with respect to the hiring issue continued into the next decade. In September 1979, the district court granted the plaintiffs' motion for partial summary judgment on this claim. The district court stated that the patronage hiring practices infringed upon the plaintiffs' rights as voters and candidates because those practices gave the incumbent party an unfair advantage in elections.

On April 4, 1983, the court entered an order enjoining the defendants from conditioning hiring decisions on an applicant's political affiliation. The City subsequently entered into a second consent judgment on June 20, 1983 ("1983 Consent Decree"), with respect to the hiring issue. *See* R.158, Ex.A. The 1983 Consent Decree enjoined the City from considering political affiliation with respect to hiring decisions, with limited exceptions for policy-making positions. Again, the court retained jurisdiction to enforce the decree, and the decree explicitly provided that an enforcement action could be initiated by any registered voter.

**2.** *Shakman II* **Decision**

Unlike the City of Chicago, several Cook County officials did not become parties to the 1983 Consent Decree. These officials appealed the district court's partial summary judgment in favor of the plaintiffs; we reviewed that decision in *Shakman II*, 829 F.2d 1387. The focus of our decision in *Shakman II* was "the constitutionality of politically-motivated hiring practices"; "other patronage-based employment practices" were not before us. *Id.* at 1393 (citations omitted). Turning to the merits of the plaintiffs' political hiring claims, we noted that significant changes had occurred since the plaintiffs had filed the original action in 1969:

> The case before us today is, from a *factual* viewpoint, a very different case from the case set forth in the complaint. The consent decree with respect to politically-motivated discharges has eliminated a significant portion of the contentions that were originally presented in the appellees' complaint and that were before this court during the earlier appeal in 1970, seventeen years ago. . . . More importantly, we are confronted with a significantly different *legal* landscape than the one that confronted the district court at the time the complaint was originally filed . . . . During these intervening years, the Supreme Court has engaged in a thorough examination of "justiciability," the limitations imposed on federal courts by the "case-and-controversy" provision of article III.

*Id.* at 1392-93 (emphasis in original; citations omitted). This intervening case law made clear that the central inquiry in determining whether a plaintiff had constitutional standing was whether that plaintiff had suffered " 'personal injury fairly traceable to the defendant's allegedly unlawful

conduct and likely to be redressed by the requested relief.'" *Id.* at 1394 (quoting *Allen v. Wright*, 468 U.S. 731, 751 (1984)).

In applying this standard in *Shakman II*, we observed that, although the plaintiffs had asserted several injuries, "the heart of the plaintiffs' case [wa]s their contention that the hiring practices of the defendants violate[d] the speech and associational rights of candidates and voters." *Id.* at 1395. We then turned to the question of whether the dilution of voters' political voice was "fairly traceable to the defendants' activity." *Id.* We determined that "the line of causation between the appellants' activity and the appellees' asserted injury [was] particularly attenuated"; we explained:

> [T]he line of causation depends upon countless individual decisions. Moreover, those countless individual decisions must depend upon . . . countless individual assessments that those who are in power will stay in power. . . . Any advantage obtained by the incumbent is obtained only if potential workers make an independent evaluation that the incumbent, not the opposition, will win. The plaintiffs will be at a disadvantage if—and only if—a significant number of individuals seeking political job opportunities determines the "ins" will remain "ins."

*Id.* at 1397. However, "[t]racing the appellees' asserted injury to the appellants' activity must depend on more than the attempt of a federal court to take the political temperature of the body politic." *Id.* at 1398 (citation omitted). In sum, the relationship between the defendants' activities and the plaintiffs' injuries were too speculative and tenuous to support Article III standing. Consequently, we held that the

plaintiffs did not have standing to pursue their hiring action against the remaining defendants.

### 3. Motion to Vacate

As we have noted already, the City was not a party to *Shakman II* and therefore remained bound by the terms of the 1983 Consent Decree. Since 1983, the City and the members of the plaintiff class have continued to litigate the scope and requirements of the 1983 Consent Decree.

In 2002, the City filed a motion to vacate the 1983 Consent Decree under Federal Rule of Civil Procedure 60(b)(4) and (5). The City submitted that *Shakman II* had held that the plaintiffs did not have standing to pursue their patronage hiring claims. Therefore, the City continued, the district court did not have jurisdiction to enter the 1983 Consent Decree, and the decree should be vacated pursuant to Rule 60(b)(4). *See* Fed. R. Civ. P. 60(b)(4) (allowing relief from final judgment when "the judgment is void"). Alternatively, the City submitted that *Shakman II*—and other cases that narrowed the field of plaintiffs who meet constitutional standing requirements—represented a change in law that warranted relief under Rule 60(b)(5). *See* Fed. R. Civ. P. 60(b)(5) (allowing a court to provide relief from judgment if "a prior judgment upon which it is based has been reversed or otherwise vacated, or it is no longer equitable that the judgment should have prospective application").

In response, the plaintiffs maintained that the motion to vacate, which was filed nearly fifteen years after *Shakman II*, was untimely; that the City's decision to adopt the consent decree prevented it from attacking the validity of that decree; and that this court's ruling in *Shakman II* did not undermine the validity of the 1983 Consent Decree.

The district court agreed with the plaintiffs. Relying on this court's decisions in *United States v. Deutsch*, 981 F.2d 299 (7th Cir. 1992), and *Kagan v. Caterpillar Tractor Co.*, 795 F.2d 601 (7th Cir. 1986), the district court first held that the Rule 60(b) motion was not timely. The district court also determined that the City could not now attack the jurisdictional basis of the 1983 decree because "a party is not entitled to relief under Rule 60(b) after making a deliberate decision not to appeal a ruling of a lower court." R.235 at 5. Finally, although the district court agreed with the City that the jurisdictional basis for the plaintiffs' hiring claims may have been called into doubt by *Shakman II*, the district court believed that the 1983 Consent Decree had accomplished more than merely settling the plaintiffs' hiring claim: The 1983 Consent Judgment also "explicitly included the obligations under the 1972 Consent Judgement." *Id.* at 6. The district court held that

> [t]he net effect [of the 1972 and 1983 decrees] was the creation of a comprehensive plan designed to minimize partisan political influence on employment decisions with respect to employees covered by the two Consent Judgments. There is simply no doubt that there is a relationship between the threatened rights of the plaintiffs and the overall employment practices of the City. . . . [The Seventh Circuit] recognized, as we do today, that the use of partisan political practices to hire, promote, assign and discharge workers, when taken in combination, potentially create a cause-and-effect relationship sufficient to invest standing in the plaintiffs.

*Id.* at 7-8. According to the district court, the "comprehensive nature of the 1983 Consent Judgment, particularly as it incorporates the terms of the 1972 Consent Judgment,

clearly distinguishe[d] the City's legal position from that of the appellants in Shakman II." *Id.* at 8.

The district court did acknowledge "the frustration that the City must feel because of the long-standing restraint of the ongoing Consent Judgment." *Id.* It advised the City that "[i]f the objective standards of performance can be established, perhaps a tentative expiration date can be set. In the meantime, the Consent Judgment certainly can be modified to reduce bureaucratic and legal expense required to comply with it." *Id.*

The City timely appealed.

## II

### ANALYSIS

The parties' arguments on appeal mirror those presented to the district court. The City first argues that the district court could not enforce the 1983 decree because the plaintiffs lacked standing to challenge the municipal hiring practices at issue. It again submits that, as a result of this lack of standing, the district court erred in denying the City's motion to vacate pursuant to Rule 60(b)(4). Additionally, the City renews its argument that the district court erred in not granting relief under Rule 60(b)(5) because this court's decision in *Shakman II* constituted a change in the law on which the 1983 Consent Decree is based. For their part, the plaintiffs reiterate the arguments on which they prevailed in the district court.

Shortly after briefing in this case was completed in this court, we decided *O'Sullivan v. City of Chicago*, 396 F.3d 843. *O'Sullivan* was an action to enforce the 1983 Consent Decree (and the plan for compliance adopted thereunder) brought

by lieutenants in the Chicago Police Department, who
claimed that the City's procedure for promotions violated
the decree. *See id.* at 851. Although *O'Sullivan* concerned an
enforcement action as opposed to a motion to vacate, the
parties in *O'Sullivan* raised many of the same arguments
that have been made with respect to the City's motion to
vacate. Both of the parties to this action submitted
*O'Sullivan* as supplemental authority and discussed that
decision extensively at oral argument.

Because *O'Sullivan* addresses many of the arguments
raised by the parties, we first shall discuss that decision. We
then evaluate the district court's disposition of the motion
to vacate in light of *O'Sullivan*.

### A. The *O'Sullivan* Decision

In 2001, lieutenants in the Chicago Police Department
brought an action to enforce the 1983 Consent Decree.
Specifically, they claimed that the City's promotional
practices violated the 1983 Consent Decree. *See id.* at 851.
The City moved to dismiss the action on the ground that the
plaintiffs had not alleged any injury to their rights as voters
and, therefore, the plaintiffs lacked constitutional standing.
The district court agreed. It observed that the decree granted
standing to voters to enforce its terms, but plaintiffs had not
alleged that the promotion practices at issue adversely
affected their rights as voters or candidates. The district
court therefore concluded that the plaintiffs had not estab-
lished the "injury in fact" required for constitutional
standing.

We reversed the district court's judgment. We first noted
that the City's argument, and the district court's acceptance
of that argument, ignored the fact that the issue of standing
had been litigated fully and resolved against the City:

In the *Shakman* litigation that led to the 1983 Consent Decree, the City maintained that the voters lacked constitutional standing to challenge hiring and promotional practices, but the district court determined that, adhering to our decision in *Shakman I*, the plaintiffs had standing. The City took no appeal from this ruling. Under such circumstances, when a federal court "has decided the question of the jurisdiction over the parties as a contested issue, the court in which the plea of res judicata is made has not the power to inquire again into that jurisdictional fact." Thus, as this court has stated, only "an egregious want of jurisdiction" will justify reconsideration of the standing issue.

*O'Sullivan*, 396 F.3d at 866 (quoting *Stoll v. Gottlieb*, 305 U.S. 165, 172 (1938), and *In re Factor VIII*, 159 F.3d 1016, 1018 (7th Cir. 1998), respectively; citations omitted).

However, we also noted that our approach to the plaintiffs' enforcement action had to be informed by recent case law that addressed the special concerns raised by institutional litigation. Specifically, in *Rufo v. Inmates of the Suffolk County Jail*, 502 U.S. 367 (1992), the Supreme Court explained that its prior statements concerning finality of judgments should not " 'take on a talismanic quality, warding off virtually all efforts to modify consent decrees.' " *O'Sullivan*, 396 F.3d at 860 (quoting *Rufo*, 502 U.S. at 380). Furthermore, *Rufo* had noted that

"[t]he upsurge in institutional reform litigation . . . has made the ability of a district court to modify a decree in response to changed circumstances all the more important. Because such decrees often remain in place for extended periods of time, the likelihood of significant changes occurring during the life of the decree is increased."

*Id.* at 861 (quoting *Rufo*, 502 U.S. at 380; citations omitted). Thus, after *Rufo*, "a party seeking modification of a consent decree does not have to prove a grievous wrong . . . ; the party only 'bears the burden of establishing that a significant change in circumstances warrants revision of the decree.'" *Id.* (quoting *Rufo*, 502 U.S. at 383; other citations and quotation marks omitted).

Reading these two lines of cases in tandem, we observed that, although our case law—and that of the Supreme Court—clearly established that parties could not ignore consent decrees that they believed had become outdated in some manner, Rule 60(b)[1] provided an avenue for local governmental authorities to seek relief from consent decrees that, as a result of changed factual or legal circumstances, may have become unjust, illegal or unenforceable. We explained that

> [t]he problem with the City's present position is that it ignores the procedural posture of this case. The present plaintiffs brought an action to *enforce* the 1983 Consent Decree, and the district court had the power to enforce that decree: "'[F]ederal courts are not reduced to approving consent decrees and hoping for compliance. Once entered, a consent decree may be enforced.'" *Frew* [*v. Hawkins*, 540 U.S. 431, 440 (2004)] (quoting *Hutto v.*

---

[1] Federal Rule of Civil Procedure 60(b) provides in relevant part:

On motion and upon such terms as are just, the court may relieve a party or a party's legal representative from a final judgment, order, or proceeding for the following reasons: . . . (5) the judgment has been satisfied, released, or discharged, or a prior judgment upon which it is based has been reversed or otherwise vacated, or it is no longer equitable that the judgment should have prospective application . . . .

*Finney*, 437 U.S. 678, 690-91 (1978)). A party may not simply ignore the decree because it believes that factual or legal changes since the decree's entry renders continued enforcement illegal or inequitable. Rather, Rule 60(b)provides an avenue to seek relief from some or all of the requirements of the original decree.

*O'Sullivan*, 396 F.3d 867-68 (emphasis in original; parallel citations omitted).

Under the procedural circumstances presented to us in *O'Sullivan*, therefore, we concluded that the district court's judgment had to be reversed. *See id.* However, we advised that

[o]n remand, assuming the City wishes to pursue the issue, the focus of the district court shall be not on the law of standing as a jurisdictional concept but on the equitable standards embodied in Rule 60(b)(5). The district court should consider critically whether changes in the legal landscape since 1983 require modification or vacatur of that decree pursuant to Rule 60(b). Specifically, the cases outlined above reveal two important developments that should guide the district court's analysis. First, *Rufo* and circuit court decisions in its wake emphasize the need for district courts to take a flexible approach to proposed modifications of consent decrees that bind public entities: "[T]he public interest and '[c]onsiderations based on the allocation of powers within our federal system' require that the district court defer to local government administrators who have the 'primary responsibility for elucidating, assessing, and solving' the problems of institutional reform, to resolve the intricacies of implementing a decree modification." *Rufo*, 502 U.S. at 392 . . . . In short, concerns of federalism should factor strongly into the court's analysis.

Second, the court must consider the significant changes in the law of voter standing since the entry of the 1983 Consent Decree. As *Shakman II* makes clear, we have serious concerns whether the plaintiffs as voters bring to the litigation the sort of concrete adverseness to fulfill the mandate of *Lujan*. The court should consider whether the class of voters has the "incentive to vigorously litigate and present the matter [of political patronage] to the court in the manner best suited for judicial resolution." Erwin Chemerinsky, Federal Jurisdiction § 2.3.2 (2003). Even given the vitality of *Swift* and its progeny, a decree fashioned in litigation in which one of the litigants did not have a sufficient concrete stake in the outcome might contain provisions that are not worthy of continued enforcement by a federal court. If the City "establishes reason to modify the decree, the court should make the necessary changes; where it has not done so, however, the decree shall be enforced according to its terms." *Frew*, [540 U.S. at 442].

*O'Sullivan*, 396 F.3d at 868 (citations omitted).

With these standards in mind, we turn to the decision of the district court denying the City's motion to vacate the 1983 Consent Decree.

## B. The District Court's Determination

Our review of a district court's ruling on a motion to vacate is a deferential one: We will disturb the district court's decision only if the district court committed an abuse of discretion. *See Browder v. Dir., Dep't of Corr. of Illinois*, 434 U.S. 257, 263 n.7 (1978). However, we note that "[a] court has abused its discretion when it commits a clear error of fact or an error of law." *Incredible Techs., Inc. v. Virtual Techs.,*

*Inc.*, 400 F.3d 1007, 1011 (7th Cir. 2005) (internal quotation marks and citations omitted).

**1.**

The district court's first ground for rejecting the City's motion to vacate was that the motion was untimely. In addition to enumerating the grounds on which a party may be granted relief from a final judgment, Rule 60(b) also provides that a motion made thereunder "shall be made within a reasonable time." Fed. R. Civ. P. 60(b).[2] "[W]hat constitutes 'reasonable time' for a filing under Rule 60(b) depends on the facts of each case." *Ingram v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 371 F.3d 950, 952 (7th Cir. 2004).[3]

A very important fact in this case is that the 1983 Consent Decree provides for the ongoing involvement of a federal district court in the hiring decisions of the City of Chicago.[4] The decisions of the Supreme Court and of this court have noted the need to avoid, when possible, interference in the decision-making process of local governmental leaders by extending, unnecessarily, the life of a consent decree whose objectives have been achieved or have become unjust, illegal

---

[2] Federal Rule of Civil Procedure 60(b) further provides that motions made pursuant to subsection (b)(1), (b)(2) or (b)(3) may not be made "more than one year after the judgment." However, the City does not seek relief under any of these subsections; therefore, the one-year limitations period is not at issue.

[3] *See also McCorvey v. Hill*, 385 F.3d 846, 849 n.4 (5th Cir. 2004); *Fed. Land Bank of St. Louis v. Cupples Bros.*, 889 F.2d 764, 767 (8th Cir. 1989).

[4] This appeal does not concern the validity or the ongoing application of the 1972 Consent Decree.

or unattainable. *See Frew*, 540 U.S. at 442; *Rufo*, 502 U.S. at 392 n.14; *O'Sullivan*, 396 F.3d at 868; *Evans v. City of Chicago*, 10 F.3d 474, 482 (7th Cir. 1993). The Supreme Court explained in *Frew*:

> The federal court must exercise its equitable powers to ensure that when the objects of the decree have been attained, responsibility for discharging the State's obligations is returned promptly to the State and its officials. As public servants, the officials of the State must be presumed to have a high degree of competence in deciding how best to discharge their governmental responsibilities. A State, in the ordinary course, depends upon successor officials, both appointed and elected, to bring new insights and solutions to problems of allocating revenues and resources. The basic obligations of federal law may remain the same, but the precise manner of their discharge may not. If the State establishes reason to modify the decree, the court should make the necessary changes; where it has not done so, however, the decree should be enforced according to its terms.

*Frew*, 540 U.S. at 442.[5]

---

[5] In *Evans v. City of Chicago*, 10 F.3d 474 (7th Cir. 1993), we also discussed the special considerations presented by a Rule 60(b) motion brought to vacate or modify a consent decree entered with respect to institutional reform litigation:

> To the objection that our approach interferes with the settlement of litigation, we have two replies. First, settlement is not an end in itself. It is a means of resolving disputes harmoniously. Many things are more important: preserving democratic governance, separating the judicial and political

(continued...)

In the present case, the district court did not consider the public nature of the litigation in reaching its conclusion that the City's motion was untimely. Indeed, the only cases cited by the district court in support of its timeliness determination are cases involving judgments against individuals. *See United States v. Deutch*, 981 F.2d 299, 302 (1992) (holding untimely a petitioner's motion to return seized property); *Kagan v. Caterpillar Tractor Co.*, 795 F.2d 601, 710 (7th Cir. 1986) (addressing 60(b) motion in employment discrimination case).

The district court's determination that the City's motion was untimely rested on the fact that the "City certainly knew about Shakman II as soon as the opinion was issued," R.235 at 4, and yet failed to act on that knowledge. However, even with respect to purely private litigation, the litigants' knowledge of the grounds for relief is only one factor for the district court to weigh. Other factors include " 'the interest in finality, the reason for delay, the practical ability of the litigant to learn earlier of the grounds relied upon, and [the consideration of] prejudice [if any] to other

---

[5] (...continued)
spheres, respecting state autonomy in the absence of a federal rule. These interests may elude a hectored district judge, eager to reach the next case in the queue, but to the political society whose long-term good the judge serves they are vital. Settlements purchased at the cost of putting the court in control of state and local budgets come at too high a cost. Second, the premise is incorrect. Attempts to enforce this consent decree have not produced the peace that settlement brings. There have been 16 years of noisome litigation. Politics is unruly and often unpleasant; judicial regulation of political affairs does not end the conflict but only shifts the venue.

*Id.* at 482 (internal citations omitted).

parties.' " *Kagan*, 795 F.2d at 610 (quoting *Ashford v. Steuart*, 657 F.2d 1053, 1055 (9th Cir. 1981) (alteration in original)). In institutional reform litigation, unlike private disputes, there are several "other parties" whose interests should be considered. The Supreme Court, in discussing Rule 60(b), has observed that "the public interest is a particularly significant reason for applying a flexible modification standard in institutional reform litigation because such decrees reach beyond the parties involved directly in the suit and impact on the public's right to the sound and efficient operation of its institutions." *Rufo*, 502 U.S. at 381; *see also O'Sullivan*, 396 F.3d at 868.

In short, any consideration of a "reasonable time" for filing a Rule 60(b) motion with respect to the 1983 Consent Decree must take into account the nature of that litigation as well as the resulting prejudice, if any, to the present elected officials and the public they represent. The district court did not consider these factors, and this failure constituted an abuse of discretion.

**2.**

The district court also held that the City's agreement to the 1983 Consent Decree prevented the City from now attacking that judgment. Specifically, the district court stated that "[t]he City's 1983 request that this Court enter the Consent Judgment, coupled with the dismissal of its appeal, prevents the City from subsequently attacking the judgment." R.235 at 5. The district court relied upon *Ackerman v. United States*, 340 U.S. 193 (1950), and *Local 322, Allied Industrial Workers v. Johnson Controls, Inc.*, 969 F.2d 290 (7th Cir. 1992), for the proposition that "a party is not entitled to relief under Rule 60(b) after making a deliberate decision not to appeal a ruling of a lower court." R.235 at 6.

We do not dispute this statement as a general proposition. However, we have noted that this rule is "not inflexible," *Allied Indus. Workers*, 969 F.2d at 292; *cf. Ackerman*, 340 U.S. at 198-99 (discussing circumstances that might justify relief from the judgment), and the need for flexibility is particularly important with respect to institutional reform litigation. As explained by the Court in *Rufo*:

> The upsurge in institutional reform litigation since *Brown v. Board of Education*, 347 U.S. 483 (1954), has made the ability of a district court to modify a decree in response to changed circumstances all the more important. Because such decrees often remain in place for extended periods of time, the likelihood of significant changes occurring during the life of the decree is increased.

*Rufo*, 502 U.S. at 380. We reiterated in *O'Sullivan* this "need for district courts to take a flexible approach to proposed modification of consent decrees that bind public entities." 396 F.3d at 868.

Institutional reform litigation, and consent decrees attendant to that litigation, involve considerations of public interest and federalism that are not present in the run-of-the-mill civil case. As both the Supreme Court and this court have made clear, the district court's recognition of the uniqueness of these cases must inform its decision whether to grant or deny a motion brought pursuant to Rule 60(b). Indeed, in our instructions to the district court on remand in *O'Sullivan*, we specifically mentioned this need for flexibility as one of the principles that "should guide the district

court's analysis." *Id.*[6] Here, the district court's failure to adopt the "flexible" approach outlined above was an abuse of discretion.

### 3.

Lastly, the district court considered, and rejected, the City's substantive argument—that the court lacked jurisdiction to enter the 1983 Consent Decree initially and also lacked jurisdiction to continue to enforce the decree.[7] The district court acknowledged that some "language from the Shakman II opinion indeed supports the City's contention that this Court should now vacate the 1983 Consent Judgment." R.235 at 6. However, the court determined that

> [u]nlike the subject matter on appeal in Shakman II, the 1983 Consent Judgment covers far more than hiring practices. The 1983 Consent Judgment explicitly included the obligations under the 1972 Consent Judgment which prohibited political firing and also prohib-

---

[6] In *O'Sullivan v. City of Chicago*, 396 F.3d 843, 868 (7th Cir. 2005), we noted that, on remand, "the significant changes in the law of voter standing since entry of the 1983 Consent Decree" also should inform the district court's consideration of any motion to vacate brought by the City.

[7] In its brief, which, as noted above, was filed prior to our decision in *O'Sullivan*, the City also argues that the district court erred in denying relief pursuant to Rule 60(b)(4). Specifically, the City reiterates the argument made to the district court that, because the plaintiffs lacked constitutional standing to bring this cause of action, the 1983 Consent Decree was void ab initio. We rejected this argument in *O'Sullivan*, 396 F.3d at 866-67, and further discussion is not warranted here.

ited "conditioning . . . any term or aspect of governmental employment, with respect to one who is at the time already a governmental employee, upon or because of any political reason or factor."

*Id.* The court thus concluded that "[t]he comprehensive nature of the 1983 Consent Judgment, particularly as it incorporates the terms of the 1972 Consent Judgment, clearly distinguishes the City's legal position from that of the appellants in Shakman II." *Id.* at 7.

In essence, the court acknowledged that our decision in *Shakman II* severely undermined the concept of voter standing to challenge municipal hiring practices. However, because the 1983 Consent Decree did not only end litigation with respect to the City's hiring practices, but also restated the terms of the 1972 Consent Decree (related to the City's responsibilities to current employees), the district court believed that the 1983 Consent Decree should not be disturbed.

The district court's opinion implies that vacating the 1983 Consent Decree will somehow undermine the 1972 Consent Decree. However, there is no factual or legal basis for this assumption. The City's motion to vacate was entitled "Defendant City of Chicago's Motion to Vacate the June 20, 1983 Hiring Consent Decree," and sought "to vacate the consent decree entered on June 20, 1983 by Judge Bua." R.157 at 1. Furthermore, in its brief in support of the motion, the City stated that "it must be clear that the City does not seek to vacate the 1972 decree which protects employees once they have been hired." R.158 at 3.[8] The City reiterates

---

[8]  The City acknowledged that, if the district court were to grant

(continued...)

this position in its brief before this court, *see* Appellant's Br. at 27 n.6 ("[W]e have not moved to vacate the 1972 decree."), a position that is not contested by the appellees. Thus, the protections contained in the 1972 Consent Decree,[9] which were crucial to the district court's determination not to vacate the 1983 Consent Decree, will remain in full force regardless of the district court's action on the 1983 Consent Decree.

Because the continued validity of the 1972 Consent Decree was not before the district court and because the 1972 Consent Decree will not be affected by the district court's determination with respect to the 1983 Consent Decree, we must conclude that the district court abused its discretion in using the 1972 Consent Decree as a basis for denying the City's motion.

**4.**

---

[8] (...continued)
its motion, paragraph H(1)(b) of the 1972 Consent Decree (providing for the district court's continued jurisdiction to enable the parties to litigate the question of whether "political sponsorship or other political considerations [could] be taken into account in hiring employees") would have to be vacated. The City further stated that "[t]he paragraphs of the 1972 decree that protect persons once they are hired, however, would not be modified as a result of this motion." R.158 at 3 n.2.

[9] The 1972 Consent Decree enjoined the City from "conditioning, basing or knowingly prejudicing or affecting any term or aspect of governmental employment, with respect to one who is at the time already a governmental employee, upon or because of any political reason or factor." R.174, Ex.4 at 3.

In sum, we do not believe that the district court's denial of the City's Rule 60(b) motion can be reconciled with this court's decision in *O'Sullivan* or the decisions of the Supreme Court in *Rufo* and *Frew*. Those authorities make clear that, when considering a Rule 60(b) motion with respect to public litigation, the nature of that litigation must factor into the district court's decision-making process; the public interest and "concerns of federalism" should guide the court's analysis. *O'Sullivan*, 396 F.3d at 868.

Furthermore, as we advised in *O'Sullivan*, we believe that the district court's Rule 60(b) analysis must account for "the significant changes in the law of voter standing since the entry of the 1983 Consent Decree," *id.*, a factor not squarely confronted by the district court's decision. "[A] decree fashioned in litigation in which one of the litigants did not have sufficient concrete stake in the outcome might contain provisions that are not worthy of continued enforcement by a federal court." *Id.* On remand, the district court should be guided by the current law of standing to determine whether the class of voters has the necessary interest in this litigation " 'to vigorously litigate and present the matter of [political patronage] to the court in the manner best suited for judicial resolution,' " or whether that task is best left to individuals directly impacted by hiring decisions made by the City. *Id.* (quoting Erwin Chemerinsky, Federal Jurisdiction § 2.3.2 (2003)) (alteration in original).

**Conclusion**

For the reasons set forth in the above opinion, the judg-

ment of the district court denying the City's motion to vacate is reversed. The case is remanded for further proceedings consistent with this opinion. The City may recover its costs in this court.

REVERSED and REMANDED

A true Copy:

Teste:

_____

*Clerk of the United States Court of*
*Appeals for the Seventh Circuit*