UNITED STATES of America Plaintiff,

v.

**Robert SORICH, Timothy McCarthy, John Sullivan, Patrick Slattery. Defendants.**

**Nos. 05 CR 644–1, 05 CR 644–2, 05 CR 644–3, 05 CR 644–4.**

United States District Court, N.D. Illinois, Eastern Division.

Feb. 15, 2006.

Patrick F. McGovern, AUSA, United States Attorney's Office, Chicago, IL, for Plaintiff.

## MEMORANDUM OPINION AND ORDER

COAR, District Judge.

Before this Court are several pre-trial motions. Defendants Robert Sorich and Patrick Slattery have filed a motion to dismiss the indictment, as well as a motion for a bill of particulars.[1] Defendant Timothy McCarthy has also filed a motion to dismiss the indictment and a motion for a bill of particulars. For the reasons stated in this opinion, the motions to dismiss the indictment and the motions for a bill of particulars are DENIED.

*Relevant Facts* [2]

The Government alleges that the Defendants devised and intended to devise, and participated in, a scheme to defraud City of Chicago (the "City") and its residents of money, property, and the intangible right to the honest services of the Defendants and other City employees participating in the hiring and promotion process. The Government also alleges that the Defendants obtained money and property by means of materially false pretenses, representations, promises and material omissions: they constantly tried to conceal their manipulation of the employment process. The Defendants and others are said to have rigged the City's hiring and promotion process so that certain applicants-individuals who were looked favorably upon because of political affiliation-were guaranteed certain jobs and promotions within the City government. Defendants, all full-time salaried employees of the City, ensured preferred candidates were awarded jobs and promotions by manipulating the scoring of hiring and promotion interviews. As part of the scheme, the Defendants are alleged to have engaged in mail fraud.

The conduct alleged in this indictment begins in the City's Office of Intergovernmental Affairs (the "IGA"), the City office that functioned in part as a liaison between the Mayor's office and other units of City, state, and federal government. While the IGA had no official role in employment decisions, the Government alleges that IGA employees nevertheless played a very decisive, unofficial role in making sure that City jobs were used to reward political supporters. Three IGA employees in particular played a large role in the scheme, according to the indictment: Robert Sorich ("Sorich"), the assistant to the Director of IGA; Timothy McCarthy ("McCarthy"), who beginning in 2001 was assigned to IGA and assisted Sorich;[3] and Individual A, an IGA employee who coordi-

---

1. Defendant John Sullivan's motion to adopt those motions was previously granted by this Court.

2. This Court will, as it must, take the allegations of the indictment as true for the purpose of these motions. *United States v. Yashar,* 166 F.3d 873, 880 (7th Cir.1999).

3. Prior to his work in the IGA, McCarthy was the assistant commissioner in charge of administering hiring and promotion for the Department of Aviation, beginning in 1996.

nated political activities and participated in the Hispanic Democratic Organization.

As part of the scheme, Sorich and Individual A worked with certain individuals known as "campaign coordinators." One such campaign coordinator was defendant Daniel Katalinic ("Katalinic"), Deputy Commissioner of Street Operations for Streets & Sanitation from 2000 until 2003. In or about 1999, at the suggestion of Sorich, Katalinic organized a group of mostly Streets & Sanitation employees to perform campaign work. Katalinic and other campaign coordinators organized groups of mostly City workers to perform campaign work. Sorich and others would direct the campaign coordinators to perform work on behalf of political campaigns, including campaigns for election to mayoral, aldermanic, U.S. Congressional, Illinois state-wide and state legislative offices.

In exchange for their work, the campaign coordinators met with Sorich, and beginning in 2001 with McCarthy, in order to submit the names of campaign workers for whom they sought favorable jobs or promotions. They knew that the interview process for non-policy positions was fraudulently administered by Sorich and McCarthy. Sorich and McCarthy instructed Katalinic and the campaign coordinators to conceal not only the submission of names to the IGA, but also the existence of meetings held for the purpose of submitting recommendations based on campaign work.

In order to reward the campaign coordinators and their political organizations for campaign work, Sorich and McCarthy would cause certain members of the campaign organizations to be hired and promoted.[4] After weighing the competing re-

quests, Sorich and McCarthy would select those candidates who were to receive jobs or promotions. The process was complicated.

In order to coordinate and track competing requests for jobs and promotions, Sorich and McCarthy directed an IGA employee to maintain documents in electronic and hard copy format.[5] The documents identified thousands of City employees in non-policymaking positions and the employees' corresponding sponsorship. Again, secrecy was emphasized: Sorich eventually instructed the designated IGA employee to conceal the existence of the documents and his or her role maintaining files related to political sponsorship, hiring, and promotion in non-policymaking positions. As further part of the scheme, Sorich directed the employee to destroy the hard copy files tracking that information.

Once Sorich and McCarthy decided which applicants they would support, they would pass these names to co-schemers. For example, in the Department of Streets & Sanitation, defendant managing deputy commission John Sullivan ("Sullivan") would take direction from Sorich and other political operatives. One of the employees Sullivan supervised was defendant Patrick Slattery ("Slattery"), the Director of Staff Services for the Department of Streets & Sanitation from on or about March 2000 through approximately July 2005. Slattery met with Sorich on a regular and frequent basis in order to receive the names of individuals that Sorich wanted to be granted jobs or promotions. After receiving his instructions, Slattery would work with Sullivan and personnel directors to manipulate and falsify the merit-based system that was used when reviewing can-

---

4. According to the indictment, Sorich and McCarthy also granted favored status for other, undisclosed reasons.

5. Another co-schemer, John Sullivan, preferred to use indexed, color-coded documents that highlighted employee political affiliation.

didates. The personnel directors would then instruct the individuals responsible for interviewing candidates on how to score the pre-selected candidates. The interviewers would score the candidates based on those directions.

When an applicant was selected by Sorich and others as worthy of a job or promotion, that applicant no longer depended on the announced channels of hiring and promotion: instead, she went through a sham process that included rigged interviews and a manipulation of interview scores. As a result of that process-a process with which every Defendant in this indictment was familiar-the preferred applicant was guaranteed a job or promotion.

Sorich and McCarthy knew and understood that the pre-selected candidates would be awarded positions on the basis of manipulated interviews and without regard to established written criteria that was in place for evaluating candidates for non-policymaking positions. They received reports about the fraudulent interview process from co-schemers in the various operating departments.

At the time that Defendants carried out their scheme, the City was subject to the Shakman Decrees, a set of consent decrees that were the result of civil litigation inspired by widespread patronage practices in City hiring. Those Decrees have been the subject of recent litigation, and have not been vacated or found void.

The scheme was, unsurprisingly, not revealed to the public. Instead, Sorich, McCarthy, Sullivan, and Slattery would cause City officials to falsely certify that political considerations played no role in the decision-making process.

Sullivan eventually made false and misleading statements to federal investigators regarding the hiring and promotion pro-cess in his department, Streets and Sanitation, in order to conceal the existence of the rigged interviews. Sullivan, Sorich, McCarthy, Slattery, and Katalinic misrepresented, concealed, hid, and caused to be misrepresented, concealed, and hidden, the purposes of the scheme as well as acts done in furtherance of it.

Count One of the indictment alleges that on or about July 15, 2004, Sorich, McCarthy, Sullivan, Slattery, and Katalinic violated 18 U.S.C. §§ 1341, 1346, 2 for the purpose of executing their hiring scheme when they knowingly caused to be delivered by mail to a Chicago address an envelope containing a letter to Streets and Sanitation Employee A that advised him that he received a promotion. Count Two alleges that on or about April 1, 2002, Sorich and McCarthy violated 18 U.S.C. §§ 1341, 1346, 2 for the purpose of executing their hiring scheme when they knowingly caused to be delivered by mail to a Chicago address an envelope containing a letter to a Sewers employee that advised him that he received a promotion. Count Three alleges that Sorich did the same when on or about June 13, 2001, he knowingly caused to be delivered by mail to a Chicago address an envelope containing a letter to a Water employee that advised him that he received a promotion. Count Four alleges that on or about August 5, 2004, Sullivan violated 18 U.S.C. § 1001(a)(2) when he knowingly and willfully made materially false, fictitious and fraudulent representations in a matter within the jurisdiction of the FBI when he states that he did not know much about the role of the Hispanic Democratic Organization in the Department of Streets and Sanitation and that the organization played no role that he knew of in getting people jobs. Count Five allege the same with respect to Sullivan's February 18, 2005 statements that he had never heard of members of Katalinic's getting preferen-

tial treatment and did not know the identity of members of Katalinic's organization.

The Government filed this indictment on September 22, 2005. On November 15, 2005, Katalinic entered into a plea agreement. Sorich, McCarthy, Slattery, and Sullivan now urge this Court to dismiss the indictment. Their motions have been fully briefed.

*Standard*

In order to withstand a motion to dismiss, "an indictment must allege that the defendant performed acts which, if proven, constituted a violation of the law that he or she is charged with violating." *U.S. v. Gimbel*, 830 F.2d 621, *624 (7th Cir.1987). The indictment must also inform the defendant of the nature of the charges so that he is able to prepare a defense and guard against double jeopardy. *United States v. Torres*, 191 F.3d 799, 804 (7th Cir.1999) (citations omitted). When determining whether to dismiss an indictment, a court must assume that all facts in the indictment are true and "view all facts in the light most favorable to the government." *United States v. Yashar*, 166 F.3d 873, 880 (7th Cir.1999). "The question before a court on a motion to dismiss is not whether the indictment alleges sufficient facts from which a jury could find that a defendant violated a given statute, but whether the Government 'conceivably could produce [such] evidence at trial.'" *U.S. v. Segal*, 299 F.Supp.2d 840, 844 (N.D.Ill.,2004) (citing *United States v. Castor*, 558 F.2d 379, 384 (7th Cir.1977)). Therefore, "[a] court should dismiss the indictment only if the Government's inability to produce sufficient evidence 'so convincingly appears on the face of the indict-ment that as a matter of law there need be no necessity for such delay.'" *Id.*

*Analysis*

The Government's theory in this case is a frontal assault on political patronage as it has been practiced in the City of Chicago. The Government argues that when political operatives who control employment decisions as to non-policy making city jobs make those decisions on the basis of party loyalty or services rendered to the party or its candidates (as opposed to the regular, published or announced criteria), that conferring of that employment benefits the party loyalist in a way that constitutes a violation of the mail fraud statute.[6]

Mail fraud is a federal crime, as established by 18 U.S.C. § 1341. The code section states, in relevant part, "[w]hoever, having devised or intending to devise any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses,...for the purpose of executing such scheme..., places in any authorized depository for mail matter, any matter or thing whatever to be sent or delivered by the Postal Service," can be found guilty of mail fraud. 18 U.S.C. § 1341.

For some time, the Courts of Appeals had read the language of the statute to include schemes that involved the deprivation of the "intangible right to honest services," as well as those schemes that involved the deprivation of money and property. The Supreme Court, when confronted with the honest services charge in *McNally v. United States*, 483 U.S. 350, 107 S.Ct. 2875, 97 L.Ed.2d 292 (1987), explained that the intangible rights theory

---

6. The government is not contending-nor could it contend-that the employment decisions with respect to policy-making jobs must also be made without respect to political affiliation. Policy positions necessarily involve the making of judgment calls that are informed by one's political persuasion. Taking such affiliation into account when allocating a job, then, is hardly the type of move that gives rise to allegations of criminal behavior.

could be defined as follows: "a public official owes a fiduciary duty to the public, and misuse of his office for private gain is a fraud." 483 U.S. at 355, 107 S.Ct. 2875. The *McNally* Court took found the intangible rights approach too expansive; it held that such a right could not be derived from the mail fraud statute. The statute did not, according to the Supreme Court, criminalize a scheme to deprive the public of "the intangible right...to good government." *Id.* at 359, 107 S.Ct. 2875.

Congress responded by enacting § 1346 the next year. Section 1346 defines "a scheme or artifice to defraud" to include not only a scheme that deprives the victim of money or property, but also "a scheme or artifice to deprive another of the intangible right to honest services." 18 U.S.C. 1346. The Seventh Circuit has interpreted the statute such that "[a]n employee deprives his employer of his honest services only if he misuses his position (or the information he obtained in it) for personal gain." *United States v. Bloom,* 149 F.3d 649, 656–7 (7th Cir.1998).

Defendants motion for a dismissal of the indictment: they allege that neither § 1341 nor § 1346 violations have been alleged, which necessarily means that 18 U.S.C. § 2 aiding and abetting violations have not been alleged.

*18 U.S.C. § 1341*

■ Defendants argue that the Government has failed to allege a deprivation of money or property. In response the Government argues, inter alia, that the Defendants deprived the City of its property right to control how its money is spent, in line with *United States v. Duff,* 336 F.Supp.2d 852, 856–57 (N.D.Ill.2004). This Court agrees.

The defendants in *Duff* were charged with a host of crimes, including mail fraud. Their scheme consisted of falsely representing to the City that certain businesses were owned by minorities or women. They made these misrepresentations so that they would qualify for set-asides available to those groups under the Chicago Municipal Code. The deceptions worked: they received both direct contracts and sub-contracts that were set-asides.

In their motion to dismiss the indictment, the Duff defendants argued that they had not violated the mail fraud statute. They stated that because the City's interest in the set-aside program's qualifications provisions was purely regulatory and could not be deemed "property" under the mail fraud statute, they had not committed a statutory violation.

The district court disagreed, finding that by depriving the City of "the power to control how its money should be spent," the defendants had deprived it of a property right in violation of the mail fraud statute. *See Duff,* 336 F.Supp.2d at 855. In its decision, the district court referred to *United States v. Granberry,* 908 F.2d 278 (8th Cir.1990). The defendant in *Granberry,* an individual with a murder conviction, obtained employment as a bus driver with a Missouri school district by concealing his conviction. The Eighth Circuit held that money in the form of wages, exclusive control of how its money was spent, exclusive control of who the school district hired, exclusive control of the distribution of a limited number of school bus driving jobs, and control over the persons and types of person employed were all "property" under the mail fraud statute. The district court in *Duff* adopted the reasoning in *Granberry.*

Defendants disagree with both *Duff* and *Granberry.* They argue that the Duff court's reliance on *Granberry* is misplaced because *Granberry* "predates and is directly contrary" to *Cleveland v. United*

*States,* 531 U.S. 12, 121 S.Ct. 365, 148 L.Ed.2d 221 (2000) and *United States v. Walters,* 997 F.2d 1219, 1225–26 (7th Cir. 1993). In *Cleveland,* the Supreme Court held that a license obtained by fraud was not "property" in line with the mail fraud statute. Licenses were granted, the Supreme Court noted, pursuant to a statute that established a typical regulatory program that resembled other licensing schemes that were traditionally viewed as exercises of police power. As the *Duff* court noted, *Cleveland* involved a defendant who lied in obtaining a license rather than a defendant whose conduct deprived the City of the power to control how its money should be spent.[7] The latter is not part of a typical regulatory program or another exercise of police power The factual distinctions between the scheme in *Cleveland* and the scheme in *Granberry, Duff,* and this case are significant enough that this Court does not believe that the latter are directly contrary to the former. Likewise, this Court finds that the scheme in *Walters* is quite different factually from the scheme in this case: here the intentional deprivation of property is directly caused by and directly benefits defendants. The deprivation of the power to control spending is not a simple by-product of the scheme in this case. This Court is not convinced that the City loses nothing when it loses the power to control its spending.

*18 U.S.C. § 1346*

■ Defendants offer several reasons why the charges brought pursuant to the "honest services" prong of § 1346 must be dismissed. They argue the honest services charges are "non-starters" because the government does not allege that there was any personal gain by the Defendants at the expense of either the City of Chicago or Chicago residents. They also contend that in bringing the charges, the Government impermissibly relies on the breach of a consent decree. In addition, Defendants add that even if it were possible to premise criminal liability upon violation of a consent decree, the particular consent decree referenced by the Government is effectively void. Finally, they argue that the § 1346 charges are constitutionally infirm and so must be dismissed.

Defendants argue that finding gain in this situation conflicts with *Bloom,* a leading Seventh Circuit decision interpreting the honest services provision. *See Bloom,* 149 F.3d 649. The defendant in *Bloom,* Lawrence Bloom, was a city alderman. During the course of his private law practice, he advised a client of a way to deprive the City of tax revenues from a property sale. Bloom told his client that the maneuver he was suggesting was both illegal and frequently undertaken. The client acted on Bloom's suggestion, and avoided paying taxes. The government brought suit against Bloom, charging him with mail fraud. The district court dismissed the portion of the charge that relied on a theory that Bloom, by advising his client, had deprived the City of his honest services. The Government appealed the district court's decision.

The Seventh Circuit affirmed the district court's decision to dismiss. The Court of Appeals, referencing the *McNally* Court's definition of honest services fraud, noted that the indictment did not allege that Bloom's position as alderman had anything to do with the actions at issue. *See id.* at 655 (the indictment "does not charge that he *used* his office in any way, let alone

---

7. This Court believes the reference to "Carpenter" in this portion of the *Duff* opinion is an error in citation. *Cleveland,* 531 U.S. 12, 121 S.Ct. 365, 148 L.Ed.2d 221 (2000), the case mentioned in the preceding sentence, dealt with licenses while *Carpenter v. United States,* 484 U.S. 19, 25, 108 S.Ct. 316, 98 L.Ed.2d 275 (1987), did not.

that he *misused* it"). The Court of Appeals went on to explain that the misuse of position for private gain "is the line that separates run of the mill violations of state-law fiduciary duty...from federal crime." *Id.* at 655. The *Bloom* Court held that an employee deprives his employer of his honest services only if he misuses his position (or the information he obtained in it) for personal gain. *Id.* at 656–7.

In this case, in contrast, there is specific language in the indictment that supports the inference that the Defendants misused their positions. The question in this case concerns whether there was gain. The Government alleges that IGA, a division within the Mayor's Office, functioned in part as a liaison between the Mayor's Office and other units of Government that included the City Council, the State of Illinois, and the U.S. Government. Sorich, an IGA employee, worked with others both in and out of IGA in a systematic effort to provide financial benefits-in the form of City jobs and promotions-in exchange for campaign work or to reward other favored persons and groups. Sorich and others directed particular campaign organizations to perform work to benefit candidates running for election to Mayoral, Aldermanic, U.S Congressional, Illinois state-wide, and state legislative offices.

This Court agrees with the Government that the indictment, when viewed in the light most favorable to the Government, indicates that the Defendants rigged the hiring process to advance the employment interests of themselves and the Mayor's campaign organization, among others. The words used by the government evoke a very specific image of how IGA determined who would be given preferential treatment in hiring. Words like "in exchange for," "reward," "benefit," and "guaranteed" all indicate that the Defen-

dants were well aware of the gains to be had from their machinations. If the Government is correct, the Defendants in this case were exacting in their allocation of favorable employment decisions-so exacting, in fact, that they created complicated and even color-coded systems to make sure that each group jostling for favors remained both relatively satisfied and indebted.

The indictment indicates that Defendants carried out the scheme because it meant that their preferred political players would get an extra, unwarranted boost with respect to campaigning. As Judge Lindberg noted in *Bauer*, providing political advantage to a patron (as a result of misuse of one's public position) and thus gaining personal job security can satisfy the *Bloom* requirement of gain. *See United States v. Bauer*, 2000 WL 1720245, *4 (N.D.Ill.2000)(finding that employee who inappropriately terminated investigations of other government employees to spare his political patron from embarrassment did personally gain from the cover-up when the patron was, as a result of defendant's actions, "in a better position to tender favors to the defendant."). In *Munson*, Judge Zagel agreed that "acts intended to curry political favor in hopes of increasing the defendant's current job security or of leading to future promotions [are] sufficient personal gain to satisfy § 1346." *U.S. v. Munson*, 2004 WL 1672880, *1 (N.D.Ill.2004)(finding that a chance for defendant to increase his business and to become client's general counsel at some future date constituted a significant personal benefit to him). The indictment in this case supports an inference that by rigging hiring decisions, Defendants, gatekeepers to non-policy positions in a victorious administration, would benefit in discrete and definite ways from the fraud. As in *Bauer*, the Defendants in this case stand to gain job security if

the Mayor remains in power and are positioned to advance in an administration that benefitted from their efforts. Not only do they gain job security, however, they also remain the key administrators of an established system of currying favors: as such, they stand in the prime position to reap benefits from people like the campaign coordinators who in turn gain from the patronage system by getting favored applicants certain City jobs.

It is true that the private gain alleged in this case-gain to a political patron and subsequent career security or advancement for the offender-is not as easy to quantify as it is in cases where the offending official lines his pockets with public funds. The honest services provision of the mail fraud statute does, however, support a finding of private gain in such situations. Defendants complain that the Government did not explicitly state its theory regarding gain: "[i]f the government's theory truly is that the personal gain is the Defendants' own jobs and the advancement of their 'political patron' then the government should have plead [sic] these theories in the indictment." While Defendants in this case would most likely appreciate it if the Government carefully laid out its entire case in the indictment, the Government is not required to do so. Instead, an indictment must merely allege that the defendants performed acts which, if proven, constituted a violation of the law that they are charged with violating. The standard for dismissal of an indictment is stringent: a court should dismiss the indictment only if the Government's inability to produce sufficient evidence so convincingly appears on the face of the indictment that as a matter of law there is no need for delay. Based on the facts alleged in the indictment, this Court is satisfied that the government will be able to produce sufficient evidence of gain and therefore will not dismiss on that ground.

■ Defendants also argue that even if the Government can prove the conduct alleged in the indictment, such conduct would not be at the expense of the City or its residents as required by *United States v. Hausmann*, 345 F.3d 952 (2003). In *Hausmann*, defendant Charles Hausmann, a personal injury lawyer, would routinely refer clients to defendant Scott Rise, a chiropractor, for chiropractic services paid from insurance settlement proceeds. Rise reciprocated by paying twenty percent of the fees he collected for those services to third-party recipients that Hausmann told him to pay. Hausmann did not disclose the kickback arrangement to his clients. Hausmann and Rise were both indicted on charges of conspiracy to commit mail and wire fraud. Hausmann eventually pled guilty, while Rise lost at trial. In their appeals, they both alleged that the government failed to allege (or, in Rise's case, to allege and prove) elements of the mail and wire fraud charges underlying the conspiracy charge.

The Seventh Circuit affirmed. After noting the standard set out in *Bloom*, the Court of Appeals stated that "under the intangible-rights theory of federal mail or wire fraud liability, a valid indictment need only allege, and a finder of fact need only believe, that a defendant used the interstate mails or wire communications system in furtherance of a scheme to misuse his fiduciary relationship for gain at the expense of the party to whom the fiduciary duty was owed." *Id.* at 956.

The Defendants presented several unsuccessful arguments on appeal, including the argument that the conduct was not at the expense of Hausmann's clients. The defendants argued that because Hausmann's clients had no right to the funds paid to Rise or the portion of those funds that were allocated to expenditures chosen

by Hausmann, they were not harmed by the scheme: in other words, that "no harm resulted to Hausmann's clients, who were deprived of nothing to which they were entitled." *Id.* at 957. The Seventh Circuit found this argument unconvincing, noting, inter alia, "[t]his reasoning ignores the reality that Hausmann deprived his clients of their right to know the truth about his compensation..." *Id.* at 957. The fact that Rise's fees were competitive or that clients received the same net benefit they would have absent the scheme was "of no consequence", the Court of Appeals determined when the scheme "converted Hausmann's representations to his clients into misrepresentations." *Id.* at 957.

Defendants contend that under Hausmann, the indictment must be dismissed. They offer no analysis as to why the facts or the law in Hausmann support such an outcome. Defendants wish this Court to interpret the phrase "at the expense" in a manner more restrictive than the Seventh Circuit did in Hausmann and wish it to do so without the benefit of any legal analysis. Moreover, they fail to address why, given that they, like Hausmann, are alleged to have made misrepresentations in violation of their duties, Hausmann does not support the conclusion that the indictment should not be dismissed. The indictment alleges that not only did the Defendants fail to disclose that the posted job selection criteria were not, in fact, being followed, but that they also rigged the process to make it appear that favored patronage candidates had been selected under the announced procedures.

The misuse of office and ensuing harms are particularly egregious in this case: the Defendants created and supported an alternative, hidden system of hiring for non-policy jobs that allowed them to use the City payroll as a personal bank account whose sole purpose was rewarding those who were politically useful, at the expense of both the City-the entity stuck with the bill-and the populace-the entity that was misled about the hiring process via the issuance of false certifications promising that hiring was apolitical. The public was manipulated into believing that hiring for non-policy positions was not political.

The argument that the public gained and was not harmed by rewarding employees for their political work because Defendants believe the political work done bettered the City and its residents is quite beside the point. As a general rule, what benefits the City and its populace is, in a sense, a policy matter. Courts should not decide criminal cases on the basis of policy choices best left to the political process. Some choices, however, are clearly made not to benefit the City or its populace but rather the decisionmakers and those who the decisionmakers favor. Defendants, who are alleged to have instituted a system of hiring that is virtually the antithesis of public representations about City hiring, are hardly in the position to evade responsibility for subverting the employment process on the grounds that their system-in their opinion-led to what they consider to be favorable results.

Given that indictments are reviewed on a practical basis and in their entirety, rather than in a hypertechnical manner and it is not necessary to spell out each element, this Court finds the allegations in the indictment sufficient to support an inference of gain as required by *Bloom*.

■ Defendants also argue both that the violation of any consent decree is an improper basis for an honest services mail fraud violation and that any violation of the 1983 Shakman Decree is not a basis for an honest services mail fraud violation because the 1983 Shakman Decree is void and can only be enforced by a contempt petitioner. Based on the briefing, it ap-

pears that Defendants believe that the Government brings this suit merely to impose criminal penalties for a violation of the 1983 Shakman Decree, the consent decree dealing with the patronage problems in City government.

The 1983 Shakman Decree and its predecessor, the 1972 Shakman Decree, are named after attorney Michael Shakman. In 1969, Shakman sought election to the Illinois Constitutional Convention. In the process, Shakman and one of his supporters decided to go after the political patronage that they felt dominated Chicago politics. They brought suit on behalf of themselves, other candidates, and voters, alleging that the defendants maintained a patronage system that awarded government jobs on the basis of the applicant's support of Democratic candidates. The plaintiffs alleged that this patronage system violated the right of voters to a free electoral process, the right of candidates to associate with supporters, and the right of public employees to associate with candidates from other parties. They sued various governmental entities and officials, including the City of Chicago and the Mayor.

The district court dismissed for lack of standing. The Court of Appeals reversed, noting that the "the misuse of official power over public employees...create[d] a substantial, perhaps massive, political effort in favor of the ins and against the outs." *Shakman v. Democratic Org.*, 435 F.2d 267, 268 (7th Cir.1970).

Following the remand, the City and others agreed to a consent judgment entered on May 5, 1972 (the "1972 Consent Decree"). The 1972 Consent Decree prohibited the City from considering "political reasons or factors" when making employment decisions related to current employees. The parties continued to litigate whether the same ban should have applied to new hires. In 1979, the district court granted plaintiffs' motion for partial summary judgment on the hiring claim. Some of the parties entered into a second consent judgment on June 20, 1983 (the "1983 Consent Decree") that enjoined the City from considering the political affiliation of new hires and included a carve-out for those who were applying for policy-making positions. The district court retained jurisdiction to enforce both decrees. Any registered voter was permitted, by the terms of the decrees, to bring an enforcement action. In 1984, the City issued its "Principles for a Plan of Compliance" and its "Detailed Hiring Provisions." "Central to the PPC was the exclusion of politics from all hiring decisions except those for exempt positions and the elimination of the effects of the past patronage hiring system." *O'Sullivan v. City of Chicago*, 396 F.3d 843, 849 (7th Cir.2005). The Detailed Hiring Provisions were amended in 1986 to provide that promotions within the same job category were exempt from the public advertising, posting, application and screening procedures only if the criterion that differentiated the two positions was period of service in the lower classified position.[8]

8. Several Cook County officials were not parties to the 1983 consent decree; instead, they opted to appeal the district court's grant of partial summary judgment to the plaintiffs on the hiring claim. The appeal raised "only the constitutionality of politically motivated hiring practices without any reference to the other patronage-based employment practices-including the discharge scheme forbidden by

the [1972] consent decree." *Id.* at 396 F.3d 843, 849. With respect to only that issue-and only those defendants-the Seventh Circuit held that the connection between patronage hiring practices and the dilution of the voter's political choice was too diluted to support standing. Then, the Supreme Court decided *Rutan v. Republican Party of Illinois,* a case which "did not speak to standing re-

Years later, two groups of registered voters, current or former police lieutenants who were denied promotions, filed an enforcement action against the City. The City argued that the complaint should be dismissed for lack of subject matter jurisdiction. The district court dismissed both cases. The Seventh Circuit reversed the decision, holding that the district court had the power to enforce the consent decree and that the City defendants who wanted relief were required to seek modification of the decree pursuant to Fed.R.Civ. P. 60 ("Rule 60").

The City filed a motion to vacate the 1983 Consent Decree in a separate suit. *See Shakman v. City of Chicago*, 426 F.3d 925 (2005). The district court denied the motion. The Seventh Circuit reversed and remanded the district court's decision. It held that the district court, in denying the City's motion to vacate as untimely, committed an abuse of discretion by failing to take into account the nature of the litigation and any resulting prejudice to both elected officials and the public they represented. *See id.* The district court, in denying the city's motion to vacate pursuant to Rule 60(b) governing relief from final judgment, also committed an abuse of discretion for failing to adopt a "flexible" approach to institutional reform litigation. Finally, the Seventh Circuit held that the district court committed an abuse of discretion when it denied the City's motion to vacate the 1983 consent decree on the grounds that it would undermine the 1973 decree. The district court has not yet issued its decision.

The history of the Shakman litigation indicates that Defendants' claim that "the 1983 Shakman Decree is void" is incorrect. This Court reminds Defendants of the Seventh Circuit's statement in O'Sullivan that "[a] party may not simply ignore the decree because it believes that factual or legal changes since the decree's entry renders continued enforcement illegal or inequitable." *O'Sullivan*, 396 F.3d 843, 868. Defendants cannot be relieved of the force of a consent decree because they believe that a vacating of the decree is imminent. The decision to vacate a consent decree is left to the courts, not to overeager defendants wishing to rid themselves of what they consider to be burdensome legal requirements.

The district court judge reviewed by the Seventh Circuit in the 2005 Shakman litigation has not issued a decision that vacates the 1983 Decree. Without such a decision, this Court will not presume, as Defendants do, that the 1983 Decree is void.

This Court also will not presume, as Defendants do, that a mail fraud violation and a Shakman Decree violation cannot be factually co-extensive without the former collapsing into the latter. The same set of facts often give rise to suits in both the criminal and the civil system. Mere reference to a civil consent decree during a criminal proceeding does not transform the proceeding into a criminal prosecution for a civil violation. Cf. *United States v. Austin*, 54 F.3d 394, (7th Cir.1995)(finding that extensive evidence of civil consent decree violation was properly admitted during criminal trial for mail and wire fraud

quirements but made clear that basing hiring decisions on political patronage was impermissible." *See O'Sullivan*, 396 F.3d 843, 851 (citing *Rutan v. Republican Party of Illinois*, 497 U.S. 62, 68, 110 S.Ct. 2729, 111 L.Ed.2d 52 (1990)). Following the decision, the plaintiffs moved to reinstate the district

court's judgment against the non-settling defendants; that order enjoined the defendants from conditioning hiring decisions based on an applicants's political affiliation. The parties eventually entered into a consent judgment similar to the 1983 Consent Decree.

when evidence showed that defendant was on notice that prints he was selling were forgeries, demonstrated that defendant knew he could not sell prints without reporting sales to the FTC, provided background to the Government's indictment, and laid the evidentiary foundation for many of the government's exhibits.). *See also U.S. v. Cohen*, 946 F.2d 430, 435 (6th Cir.1991)(holding that district court did not err admitting into evidence a consent judgment from companion civil suit)(citing *United States v. Serian*, 895 F.2d 432 (8th Cir.1990); *United States v. Parker*, 839 F.2d 1473 (11th Cir.1988); *United States v. Gilbert*, 668 F.2d 94 (2nd Cir.), *cert. denied*, 456 U.S. 946, 102 S.Ct. 2014, 72 L.Ed.2d 469 (1982); *United States v. King*, 505 F.2d 602 (5th Cir.1974); *New England Enterprises, Inc. v. United States*, 400 F.2d 58 (1st Cir.1968), *cert. denied*. 393 U.S. 1036, 89 S.Ct. 654, 21 L.Ed.2d 581 (1969)).[9]

Defendants argue that the indictment should be dismissed because it is essentially a criminal prosecution for a breach of contract. But simply because Defendants' actions can be considered violations of the "contract" that is a Shakman Decree does not mean that those same actions do not qualify as violations of the mail fraud statute. The Government at no point states that it is bringing suit because Defendants violated either Shakman Decree; the indictment states that it brings suit because Defendants allegedly violated the mail fraud statute.

 In order to allege fraud under the intangible rights doctrine, the Government must allege that the Defendants misused their positions for private gain and thus breached their fiduciary duties. The Shakman Decrees come into play because, among other reasons, they are one type of source that the Government uses to illustrate the scope of the Defendants' fiduciary duties. The indictment offers a variety of sources to illustrate the scope of Defendants' duties, including the Chicago Governmental Ethics Ordinance, the Chicago municipal code, the Illinois code, the Illinois constitution, and the Shakman Decrees.[10]

Other courts have looked to sources other than the federal criminal statutes in an effort to understand the contours that shape a defendant's duties. In *United States v. Hausmann*, 345 F.3d 952 (7th Cir.2003), for example, the Seventh Circuit explained that the indictment clearly and correctly stated the fiduciary relationship between Hausmann and his clients, and cited to a comment to the Wisconsin Supreme Court Rules of Professional Conduct for Attorneys for support. In *United States v. Bauer*, Judge Lindberg looked to Illinois Administrative Code for guidance as to the scope of the duties of a defendant charged with mail fraud. *United States v. Bauer*, 2000 WL 1720245, *7 (N.D.Ill. 2000). He noted, "[w]hile a public official's duties may be broader than those defined in a statute, they surely encompass at least those duties, and defendant's failure to meet those duties could have resulted in a deprivation of the public of his honest services."

9. While the question of whether evidence of a consent decree violation may be admitted into evidence is procedurally distinct from the question of whether a consent decree violation may be referenced in an indictment, this Court does find the reasoning in Austin helpful when reviewing Defendants' motion to dismiss the indictment. As in Austin, this case presents a situation where consent decree violations help shed light on the conduct at issue.

10. The Decrees also provide motive for the Defendants' actions in falsifying official records and concealing their fraud.

In addition, even without reference to the Shakman Decrees, the Government has adequately alleged a breach of fiduciary duty based on City and state laws and regulations.[11] The Defendants take issue with this position as well. They argue that permitting this prosecution to proceed would create a future where federal criminal prosecution ensues "any time someone allegedly violates the City's personnel rules...makes a false statement on a City form...or makes a false entry in any book, report, or statement to a local unit of government or school district..." This Court does not find the situation to be so dire. After all, those examples would not form a sufficient basis for mail fraud prosecution if the *Bloom* standard was not met. Moreover, there is reason to believe that those sorts of prosecutions might lead courts to find the types of constitutional violations that are referenced later in this memorandum. In short, this Court cannot conclude that the 1983 Consent Decree is void or that the basis for the mail fraud violation is a violation of that decree.[12] Defendants also challenge the constitutionality of § 1346. They claim that the phrase "intangible right of honest services" is facially vague and vague as ap-

plied in this case. They also contend that 1346 raises federalism concerns.

■ As Defendants themselves acknowledge, while "18 U.S.C. § 1346 has been frequently attacked as unconstitutional," it has survived those attacks in multiple courts, including the Seventh Circuit. *See Hausmann,* 345 F.3d 952; *see also, United States v. Rybicki,* 354 F.3d 124 (2nd Cir.2003)(en banc), *cert. denied,* 543 U.S. 809, 125 S.Ct. 32, 160 L.Ed.2d 10 (2004); *United States v. Brumley,* 116 F.3d 728 (5th Cir.1997), *cert denied,* 522 U.S. 1028, 118 S.Ct. 625, 139 L.Ed.2d 606 (1997); *United States v. Welch,* 327 F.3d 1081 (10th Cir.2003), *United States v. Gray,* 96 F.3d 769 (5th Cir.1996), *cert denied,* 520 U.S. 1129, 117 S.Ct. 1275, 137 L.Ed.2d 351 (1997).

For example, the *Hausmann* appellants also argued, inter alia, that § 1346 should be void for vagueness. *Id.* at 958. Appellants argued that the statute did not provide them with adequate notice that their kickback scheme was illegal and that application of the statute to the facts of the case invited the government to "arbitrarily police the fairness of private business transactions through enforcement of criminal

---

**11.** At this point is important to note that Defendants do not argue that the consent decree should not form the basis of the indictment (which they contend it does) because it is not state law. The issue is one that appears to be of interest to the Seventh Circuit, as evidenced in *United States v. Martin,* 195 F.3d 961 (7th Cir.1999). In *Martin,* the Seventh Circuit briefly touched upon the issue of whether "the fiduciary duty the breach of which is charged as mail fraud must have its source in state law..." *Martin,* 195 F.3d at 967. *Martin's* argument is easy to summarize; he claimed that the Seventh Circuit should follow the Fifth Circuit's *Brumley* decision, which required that the fiduciary duty was required to be grounded in state law, but only cited the case and its conclusion. *See United States v. Brumley,* 116 F.3d 728 (5th Cir.1997). The *Martin* court stated that the

Seventh Circuit did not require such a showing, and refused to adopt the Fifth Circuit's position for the time being. Accordingly, this Court will not require that the fiduciary duty have its source in state law.

**12.** Defendants also argue that a distinction should be drawn between a breach of contract and criminal fraud such that the parties would have had to have entered the Shakman Decrees knowing they did not intend to perform. According to Defendants, because they were never parties to the Consent Decrees, they could not have entered the Decrees with the intent to defraud. This argument is without merit. This Court will not discuss it at length given that Defendants offer neither law nor facts to suggest that they were not bound by the terms of the Consent Decrees.

statutes." *Id.* at 958. The Court of Appeals summarily dismissed the first argument, explaining that "this Court's decision in Bloom, [fn3] placed Appellants on notice that criminal liability under the mail and wire fraud statutes-particularly under an intangible-rights theory-attaches to the misuse of one's fiduciary position for personal gain." *Id.* at 958.

Defendants counter that this case is different because "no one could have guessed" that the conduct alleged in the indictment was covered under the purview of the honest services provision. This Court disagrees. What the government charges-that public employees who create a complex, clandestine process for rigging purportedly neutral hiring processes in order to benefit themselves and their patrons are depriving their employers of their honest services-is neither the kind of incredible allegation that is bound to ensnare an honest civil servant intent on doing her job nor is its prosecution entirely unprecedented in criminal case law even within this Circuit. *See United States v. Hogan*, 54 F.3d 336 (7th Cir.1995); *United States v. Dvorak*, 115 F.3d 1339 (7th Cir. 1997).

For example, in *United States v. Dvorak*, the Seventh Circuit affirmed a defendant's sixty month sentence for mail fraud that involved corrupt hiring practices. *See Dvorak*, 115 F.3d 1339 (7th Cir.1997); The defendant in that case, Dvorak, a high ranking official in the Cook County Sheriff's Department, devised a fraudulent hiring scheme "aimed at providing jobs to individuals who were favored, for personal or political reasons..." *Id.* at 1341. Dvorak would "review the list of applicants" and "determine which of the individuals should be given preferential treatment." *See id.* He would then return the list to his immediate subordinate, Hogan, who in turn would also select individuals for preferential treatment. *See id.* Hogan would then deliver the list to the low-level employees responsible for grading the qualifying merit exams. *See id.* Those employees would ensure that the favored individuals were assigned passing scores, making them eligible for employment with the Sheriff's Department. *See id.* Hogan was charged in a case of his own, and his sentence was also upheld. *See Hogan*, 54 F.3d 336 (7th Cir. 1995).

Defendants argue that *Dvorak* and *Hogan* "are so far afield from this case it is absurd." Part of the reason, they claim, is that neither *Dvorak* nor *Hogan* contested their guilt or the propriety of their charges. There is no reason to believe that had *Dvorak* or *Hogan* contested their guilt or the propriety of their charges, they would have succeeded. In fact, the favorable language in *Hogan* suggests precisely the opposite with respect to the propriety of their charges. *See Hogan*, 54 F.3d at 341 ("Hogan's cheating instead resulted in a harm that is quite hard to quantify. In a very real sense, he committed fraud upon the public. His actions distorted the applications process, creating a system that was both unfair to good faith applicants and to the public at large...").

Defendants also argue that the cases are different because a part of *Dvorak* and *Hogan's* scheme involved taking bribes and instituting a ghost payroll. That difference is not dispositive. The fact that the Defendants in this case did not receive actual monetary bribes is not sufficient to make the statute unconstitutionally vague. *Cf. Spano*, 421 F.3d at 602–3 (finding a defendant's argument that she was not guilty of depriving the government of her honest services because she did not receive monetary benefits from the fraud a "non sequitur" and adding that "[a] participant in a scheme to defraud is guilty even if he

is an altruist and all the benefits of the fraud accrue to other participants..."(citing *Lombardo v. United States,* 865 F.2d 155, 159–60 (7th Cir.1989); cf. *United States v. Moede,* 48 F.3d 238, 242 (7th Cir.1995); *United States v. Blasini–Llueberas,* 169 F.3d 57, 65 (1st Cir.1999); *United States v. Oplinger,* 150 F.3d 1061, 1065 (9th Cir.1998))).

Defendants also argue that the statute encourages arbitrary enforcement. In *Hausmann,* the Seventh Circuit determined that the statute did not authorize or encourage arbitrary and discriminatory enforcement. The Court of Appeals decided: "the existence of Hausmann's fiduciary duty owed to his clients distinguishe[d] the case from one where the government arbitrarily and impermissible relies upon the mail and wire fraud statutes to enforce merely the terms of a private contract." *Id.* at 958. This Court does not, on the basis of Defendants' briefing, find any reason to part ways with the Seventh Circuit or distinguish prior Seventh Circuit case law from the case at hand. This Court is not convinced, despite Defendants' forceful assertion, that prosecutors ignore essential elements of the statute nor does it conclude that the fact that there is disagreement as to the interpretation of the statute means the statute should be held unconstitutional. In this case, this Court concludes that the statute and case law gave Defendants reasonable notice that the charged conduct was criminal.

■■■ Defendants also argue that the Seventh Circuit "failed to go far enough" when it did not hold that § 1346 creates an impermissible *common law crime.* This argument is also unconvincing. Defendants forget-or perhaps ignore-that this Court is bound by Seventh Circuit prece-dent. A simple statement that the Seventh Circuit did not go far enough is hardly the type of rationale that will justify disregarding established precedent. There is also no reason to believe the statute is so broad that it permits prosecutors to pursue "personal predilections" and thus violates the separation of powers.

The problem with this case is not that the Defendants stood to gain. Vigorous campaigning makes for a healthy democracy. The problem is that the Defendants abused their positions as public officials in order to reward and encourage partisan campaigning. By creating a complicated system that ensured preferred candidates would be rewarded with jobs and promotions in exchange for political support, the Defendants were no longer providing their honest services to the City that employed them or the City's residents. Furthermore, they were on notice that what they were doing would support a charge of mail fraud; regardless, they sought to conceal the conduct. That conduct, as alleged in the indictment, can support a charge of mail fraud under § 1346.[13]

*Bill of Particulars*

■■■ Defendants also filed motions requesting that this Court order the Government to file a bill of particulars. The Court's power to order the Government to file a bill of particulars is governed by Fed.R.Crim.P. 7(f) ("Rule 7(f)"), which states: "The court may direct the government to file a bill of particulars. The defendant may move for a bill of particulars before or within 10 days after arraignment or at a later time if the court permits. The government may amend a bill of particulars subject to such conditions as justice requires." "The test is whether the indictment sets forth the elements of the offense charged and sufficiently apprises

---

**13.** Defendants offer no additional, independent reason for dismissal with respect to the 18 U.S.C. § 2 violations. This Court does not dismiss any portion of indictment as it relates to those violations.

the defendant of the charges to enable him to prepare for trial." *United States v. Roya,* 574 F.2d 386, 391 (7th Cir.1978) (internal citations omitted). A court may find that it is necessary to order a bill of particulars if the indictment fails to provide sufficient notice of the charges in order to adequately allow the defendant to prepare for trial. *United States v. Vasquez–Ruiz,* 136 F.Supp.2d 941, 942 (N.D.Ill.2001) (citing *United States v. Kendall,* 665 F.2d 126, 134 (7th Cir.1981)). When deciding whether to grant a defendant's request for a bill of particulars, a court can consider such factors as the: (1) complexity of the charges; (2) clarity of the indictment; and (3) degree of discovery available to the defense absent a bill of particulars. *Vasquez–Ruiz,* 136 F.Supp.2d at 943 (internal citations omitted).

■ While this case is relatively complex, this Court does not believe that the complexity necessitates a bill of particulars. The indictment lays out the specific instances of mail fraud, and when they occurred. Moreover, based on the briefing in this case, it appears that the Government has made discovery available and will continue to do so. McCarthy's specific requests suggest that he would like the Government to essentially explain how it is going to try its case; such requests need not be granted. At this stage in the proceedings, this Court does not find it appropriate to order the Government to file a bill of particulars. If proper discovery is not made available, Defendants may file a motion in this Court at that time.

### Conclusion

For the foregoing reasons, Defendants' motions to dismiss the indictment and motions for a bill of particulars are DENIED.